**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO.** |
| **TONY L. WEBBER** | § | **06-30434** |
| **DEBTOR** | § | |
| **JOAN GRIGGS** | § | **ADV. NO.** |
| **PLAINTIFF** | § | **06-03158** |
| **vs.** | § | |
| **TONY L. WEBBER** | § | |
| **DEFENDANT** | § | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

This Memorandum Opinion addresses the issue of whether Dr. William Griggs, Ph. D. (Griggs) deceived Tony L. Webber (the Debtor) into entering a Stock Purchase Agreement. The Debtor claims that Griggs, now deceased, and his wife, Joan Griggs (Mrs. Griggs), deceived him into entering the Stock Purchase Agreement, that the Stock Purchase Agreement is therefore null and void, and that he is relieved from making the remaining payments for Griggs' stock. Mrs. Griggs, the sole beneficiary of her late husband's estate, claims that, after making several payments for Griggs' stock, the Debtor defaulted and therefore breached the Stock Purchase Agreement. Mrs. Griggs now seeks judgment against the Debtor for the remaining amount owed under the Stock Purchase Agreement and Promissory Note associated therewith. For the reasons set forth below, this

1

Court holds that Griggs and his wife did not deceive the Debtor into entering the Stock Purchase Agreement. Consequently, Mrs. Griggs is entitled to the remaining payments from the Debtor for his purchase of Griggs' stock. This Opinion sets forth how this Court has arrived at its decision.

On July 6, 2006 and July 7, 2006, this Court held a hearing in the above referenced adversary proceeding. A simultaneous hearing was also held on the Debtor's Objection to Mrs. Griggs' Proof of Claim (Claim No. 3). On July 11, 2006, pursuant to Federal Rule of Civil Procedure 52, as incorporated into Federal Rule of Bankruptcy Procedure 7052, this Court made its oral Findings of Fact and Conclusions of Law. This Court has reduced its Findings of Fact and Conclusions of Law to writing in this Memorandum Opinion, which will be entered on the docket. To the extent that any of this Court's oral Findings of Fact and Conclusions of Law conflict with this Court's written Findings of Fact and Conclusions of Law, the written Findings of Fact and Conclusions of Law shall govern and shall be considered amendments to the oral Findings of Fact and Conclusions of Law. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

## II. FINDINGS OF FACT

1.   Griggs was a Fulbright Scholar who earned a Ph. D. in museum history from Texas Tech University. After earning this degree, he became the Director of the Panhandle Plains Museum in Canyon, Texas. Thereafter, he became the Chairman of the Texas Antiquities Committee. Eventually, he came to work in Houston. He was very well respected in the museum industry, and in 1987 founded a company in Houston called International Museum Corporation d/b/a Southwest Museum Services (the Company).

2.   Griggs held 50% of the stock when he founded the Company.

3.   When Griggs was in the process of establishing the Company, Griggs convinced the Debtor to join him in running the Company by offering him a 50% ownership in this entity. The Debtor accepted Griggs' offer and became the owner of the other 50% of the Company.

4.   A stock certificate for 500 shares evidenced the Debtor's 50% ownership of the Company. Similarly, Griggs' stock certificate for 500 shares evidenced his 50% ownership of the Company. [Griggs' Exhibit No. 17.]

5.   Griggs and the Debtor were the only officers of the Company. Griggs was the President and the Treasurer. The Debtor was the Vice-President and the Secretary. Additionally, Griggs and the Debtor were the only Directors of the Company, with Griggs serving as Chairman of the Board. [Debtor's Exhibit No. 1.]

2

6. The Company was in the business of raising money for the construction of museums and designing and constructing exhibits for museums. Griggs' primary role was to develop clients for the Company; the Debtor's primary role was to design and construct the exhibits for the clients whom Griggs brought to the Company. Griggs' role of developing business was crucial to the Company's success, and the Debtor has always known this fact.

7. In 1997, the Debtor made a proposal to Griggs to purchase Griggs' 50% ownership of the Company for the amount of $430,000.00. Griggs declined this offer.

8. In 2000, the Debtor again made a proposal to Griggs to purchase his 50% ownership of the Company for the amount of $430,000.00. [Griggs' Exhibit No. 32.] Griggs again declined this offer.

9. In 2001, Griggs brought in a significant piece of business to the Company when he secured a contract with Shell Oil Company, which generated substantial revenues for the Company and net income for Griggs and the Debtor. Indeed, in 2001, Griggs and the Debtor received bonuses exceeding $500,000.00.

10. The Debtor gave Sterling Bank a written financial statement dated March 22, 2002 [Griggs' Exhibit No. 13.] in which he represented that the value of his stock in the Company was $566,800.00.

11. In early April of 2002, Griggs underwent a physical examination in order to procure an insurance policy.

12. The results of this physical examination showed that Griggs had elevated liver enzymes. After learning about these results, Griggs scheduled an appointment with his family doctor, Dr. Kevin Giglio (Dr. Giglio).

13. On April 22, 2002, Griggs met with Dr. Giglio, who decided to schedule a CT biopsy for Griggs.

14. On April 25, 2002, Griggs and the Debtor wrote a letter to Ben B. Turner (Turner), an attorney in Houston who has represented the Company in various legal matters. [Debtor's Exhibit No. 7.] The letter set forth that Griggs and the Debtor—concerned over what would happen to the Company if Griggs or the Debtor suddenly died—had both decided to enter into an agreement whereby in the event of Griggs' or the Debtor's death, the survivor would purchase the stock of the deceased for the sum of $750,000.00, payable over a period of two years at an interest rate of 8% per annum. Griggs and the Debtor asked Turner to draft the agreement, which Turner did. [See Finding of Fact No. 17.]

15. In early May of 2002, Griggs underwent a CT biopsy. [See Griggs' Exhibit No. 25A.] Dr. Giglio reviewed the results of this biopsy and referred Griggs to M.D. Anderson Cancer Center for treatment. Id.

16. By no later than May 14, 2002, Griggs was diagnosed with cancer. At some point thereafter and well before December 6, 2002, the Debtor became aware of this diagnosis.

17. On May 24, 2002, Griggs and the Debtor, in their capacities as stockholders of the Company, executed a document entitled "International Museum Corporation Stock Purchase Agreement." [Griggs' Exhibit No. 29.] Article II, Section 2.02 of this agreement expressly states that the Company and "the Stockholders mutually agree that the total value of all

3

shares of stock for the further determination of the offering price thereof as hereinafter provided shall be a total of $1,500,000.00." *Id.* Further, Article II, Section 2.03 provides that if either Griggs or the Debtor dies, the surviving shareholder shall be allowed to purchase the deceased shareholder's stock at the purchase price of $750,000.00. *Id.*

18.   On June 12, 2002, Griggs met with Dr. Yohuda Patt at M.D. Anderson Cancer Center. [Griggs' Exhibit No. 25A.] Dr. Patt's written report states that Griggs had a cancerous tumor in his liver. *Id.* The report does not set forth what Dr. Patt told Griggs about this tumor. *See id.* Dr. Patt's report reflects that he wanted more tests performed on Griggs and that Griggs would return later in the month to discuss the results of the tests and what measures should be taken. *Id.* Dr. Patt's written report also states as follows:

> PHYSICAL EXAMINATION: This is an entirely asymptomatic 69 year old gentleman who looks younger than his stated age, in no acute distress, in no discomfort. . . .   The patient continues to work in his business.

*Id.*

19.   On June 27, 2002, Griggs met again with Dr. Patt, whose written report sets forth that Dr. Patt discussed the tumor with Griggs and recommended chemotherapy as the treatment. [Debtor's Exhibit No. 21.] Dr. Patt's report states the following:

> Thus, we have a patient with a stigmata of cryptogenic cirrhosis of unknown etiology. He has now developed multifocal cholangiocarcinoma. The tumor is quite extensive in the liver and involves the portal vein with evidence of portal hypertension. I discussed with the patient the possibility of starting him on chemotherapy in view of the extent of his disease. I discussed with him the possibility of the fact that the median survival is at best 15 months. I explained to the patient that with the treatment with the Gemzar, amifostine and cisplatin, he has a chance of between 10 to 20% of inducing antitumor response with minimal toxicity.   The potential for neutropenia, thrombocytopenia and fluid accumulation have all been explained, and the patient expressed verbal understanding and gave verbal consent to proceed with this treatment.

[*Id.* at 143.]

20.   In August of 2002, Griggs told the Debtor that he (i.e., Griggs) was ill.

21.   On August 14, 2002, Griggs gave the Debtor a preliminary listing of major projects. [Debtor's Exhibit No. 15.] This list set forth the names of 15 museums with which the Company might enter into a business relationship. *Id.* The projected revenues were $75,000,000.00. *Id.*

22.   On August 21, 2002, Griggs again met with Dr. Patt at the M.D. Anderson Cancer Center. [Griggs' Exhibit No. 25D.] Dr. Patt's notes do not reflect what, if anything, Dr. Patt told Griggs about his prognosis. *Id.* However, Dr. Patt wrote the following:

> CT scan of the abdomen shows the multicentric hepatic tumor. The primary liver lesion with perfusion abnormalities has not significantly changed in appearance. The other lesions in both right and left lobe of the liver may

4

actually be somewhat smaller when reviewed; however, this was reviewed by the radiologists who think that they are bigger, but my impression is that they are smaller, if anything.

ASSESSMENT AND PLAN: In view of the probable stability of the disease on the CT scan, the decrease in the CA-125 and the good tolerance of the treatment, I decided to continue the patient on the same treatment. In view of the ascites which is increasing, I will start the patient on spironolactone 200 mg q.d. and Lasix 20 mg q.o.d. or twice weekly. The patient will continue the same treatment q.2weeks. He will come back for re-staging in approximately two months.

PHYSICAL EXAMINATION: Physical examination reveals this youthful looking 69-year-old gentleman who looks younger than the stated age and in no acute distress and in no discomfort. . . .There is no pain.

[Griggs' Exhibit No. 25D.]

23.   In September of 2002, Griggs told the Debtor that he (i.e., Griggs) had a few spots on his liver.

24.   On October 23, 2002, Griggs returned to the M.D. Anderson Cancer Center to meet with Dr. Melanie Thomas, who had taken over for Dr. Patt upon the latter's departure from the Center. [Griggs' Exhibit No. 25F.] The notes of this meeting, which were written by a physician's assistant named Deborah Siegler, do not reflect what, if anything, Dr. Thomas told Griggs about his prognosis. However, the following is contained in these notes:

RADIOGRAPHIC DATA: The patient underwent a re-staging evaluation. The chest x-ray showed no evidence of metastatic disease. The CT scan of the abdomen showed a large, dominant lesion in the right lobe of the liver with multiple, metastatic nodules throughout both lobes of the liver that showed very, very slight progression when compared to August. However, when we reviewed the film, it appears to be almost stable disease. There was a tiny amount of paracolic ascites on the right. . . .

Mr. Griggs is a 69-year-old gentleman from Houston who in late 05/02 was diagnosed with a multifocal, intrahepatic cholangiocarcinoma. He has been treated with 8 courses of GAP. He has shown no improvement, but it looks like at best he has some stable disease. He tolerates chemotherapy extremely well having only some minor fatigue on day 2. Therefore, we would like to proceed and give him another 2 courses of GAP and doses of gemcitabine at 750 mg/m2 and cisplatin 25 mg/m2 both on day 1 and day 15. He will return for re-staging in 2 months.

[Griggs' Exhibit No. 25F.]

25.   On October 24, 2002, Griggs sent a memorandum to the Debtor setting forth that no disclosure should be made of ownership changes in the Company unless and until the transfer of stock was completed. [Debtor's Exhibit No. 8.]

26.   On or about November 14, 2002, Griggs, or someone at his request, drafted a document entitled "Preliminary Draft of Contract Sale Between William C. Griggs and Tony Webber

for the Sale of Stock of Southwest Museum Services." [Debtor's Exhibit No. 3.] This document reflected, among other things, that the Debtor would pay Griggs $750,000.00 to purchase Griggs' 50% stock interest in the Company. *Id.*

27.    In late November or early December 2002, Griggs told the Debtor that his cancer was in remission and that he was through with his chemotherapy. Griggs was not a medical doctor or an expert.

28.    On or about December 6, 2002, Griggs and the Debtor executed a document entitled "Stock Purchase Agreement." [Debtor's Exhibit No. 6.] This agreement evidences the transaction between Griggs and the Debtor whereby Griggs sold his 500 shares of the Company to the Debtor for the amount of $750,000.00. The Debtor purchased the stock owned by Griggs, by paying cash in the amount of $50,000.00 to Griggs and simultaneously executing and delivering to Griggs a promissory note (the Note) in the original principal amount of $700,000.00 bearing interest at 8% per annum. [Griggs' Exhibit No. 5.] As collateral for the Note, the Debtor gave a security interest to Griggs in the stock which Griggs sold to the Debtor. Evidence that the Debtor intended to convey a security in this stock to Griggs is found in two documents: (1) the Note; and (2) the Stock Purchase Agreement. The last paragraph of the Note, which the Debtor signed, expressly states that "[t]he payment of this note is secured by the stock of William C. Griggs in International Museum Corporation d/b/a Southwest Museum Services." (Griggs' Exhibit No. 5.) The last sentence in paragraph III of the Stock Purchase Agreement expressly states that "[a]s security for the payment of the note, Griggs' stock will be endorsed for transfer but held by the attorney for the Company, Ben B. Turner, Jr. (Turner) until final payment is made." [Griggs' Exhibit No. 4.] Finally, the Debtor expressly stated at trial that the stock that he purchased from Griggs secured repayment of the Note. Turner still has possession of the stock. In paragraph seven of the Stock Purchase Agreement, Griggs "agreed to continue to work for the Company at the present pay rate and with the present allowances. He will physically be in the Company offices or on Company business for at least three working days per week, not counting any time off because of illness." [Debtor's Exhibit No. 6.]

29.    On December 17, 2002, Griggs underwent his last chemotherapy treatment.

30.    On January 8, 2003, Griggs returned to the M.D. Anderson Cancer Center for a follow-up meeting with Dr. Thomas. [Griggs' Exhibit No. 25H.] Dr. Thomas' notes from this meeting do not reflect what, if anything, she told him about his prognosis. *See id.* However, she did write the following:

> INTERVAL HISTORY: The patient is a 69-year-old gentleman from Houston who was diagnosed with multifocal unresectable intrahepatic cholangiocarcinoma in 05/02. He had been followed and treated by Dr. Patt until I took over his care in 10/02. The patient was initially treated by Dr. Patt with two courses of GAP chemotherapy. At presentation, he had small to moderate volume disease, primarily in the right lobe of the liver. On his initial restaging in late August, he was felt to have stable disease and was continued on GAP chemotherapy. He was last seen by us on 10/23/02. At that time the patient had been tolerating his chemotherapy extremely well with essentially no symptoms other than fatigue on days 2 and 3. He continues to work nearly full time as a consultant and designer of museum exhibits. Of note, the patient is also a historian and writer, and currently is writing his third book. In late 10/02 we again felt that

his disease was essentially stable. We opted to continue him on GAP chemotherapy. He has now received four more treatments and presents here today for restaging. Overall, again he continues to tolerate GAP chemotherapy extremely well. He will have fatigue on days 2 and 3, which causes him to spend most of the day lying around the house. There is no nausea, vomiting, no other abdominal pain, no mucositis, no fevers or chills. He has been able to travel and again works essentially full time. His appetite is good. He is eating well. There is no headache, no shortness of breath, no chest discomfort, no abdominal pain, no change in bowel or bladder habits. There is no neurological change, no numbness or tingling in his fingers or toes.

RADIOGRAPHIC DATA: I reviewed his old films in detail. There is an increase in what was previously a small amount of ascites, although it is still a small amount of fluid. He does appear to have some progression of his hepatic metastases; however, he still has a small to moderate volume disease and there is not significant progression. Overall, however, given the doubling of his CA 125 as well a[s] some progression on the CT scan, overall this picture is consistent with progressive disease.

ASSESSMENT AND PLAN: This is a 69-year-old man with unresectable cholangiocarcinoma who has had an approximately seven month period of essentially stable disease on GAP chemotherapy which he has tolerated very well. Unfortunately, at this time he appears to have progressed both in terms of tumor marker and also on the CT findings. Since he has such a good performance status, he would like to continue some sort of systemic treatment. For options, we discussed single-agent Xeloda as well as possible chemoembolization. At this time, due to his work schedule, his preference is to not undergo chemoembolization in that it involves a multiple-day admission to the hospital. Therefore, we will start on Xeloda at 2 g/m2 in divided dose per day. He was counseled as to all the side effects of Xeloda. He will return to clinic with me in three weeks for interval chemotherapy check. The plan would be to give him two courses of Xeloda and then repeat the restaging evaluation.

PHYSICAL EXAMINATION: . . . General: He appears younger than his stated age, very pleasant, well-appearing man in no acute distress. . . . .

*Id.*

31.    On or about January 28, 2003, Griggs gave the Debtor a list of "One Million Dollar Plus Prospects." [Debtor's Exhibit No. 16.] This list reflected potential revenues of $57,700,000.00.

32.    On February 3, 2003, Griggs returned to the M.D. Anderson Cancer Center for another follow-up meeting with Dr. Thomas. [Debtor's Exhibit No. 25I.] Dr. Thomas' notes from this meeting do not reflect what, if anything, she told him about his prognosis. *Id.* However, she did write the following:

INTERVAL HISTORY: The patient is a 69-year-old man from Houston who was diagnosed with multifocal unresectable intrahepatic cholangiocarcinoma in 05/02. He was initially treated with 2 courses of GAP chemotherapy. On his initial restaging in late August, he was felt to have stable disease and was continued on GAP. As of early January, he has completed a total of 6 months of GAP chemotherapy which he tolerated very well. He had been essentially a Zubrod 0-1 with some ongoing fatigue as his major complaint. However, he was otherwise able to work nearly full-time. In early January, he was found to have shown some progressive disease, and the GAP chemotherapy was discontinued. At that time, he was started on oral Xeloda at a dose of 2,000 mg/m2 per day divided dose. His last dose of Xeloda was 01/22. Overall, he tolerated the Xeloda extremely well. He does complain that it makes him feel fatigued; however, no more than on his previous chemotherapy. He does take one short nap usually per day. He had one episode of diarrhea on day 7 for which he took Imodium. Otherwise, his bowel and bladder habits have been within normal limits. He denies any mucositis. There is no hand-foot syndrome, no complaints of neuropathy. He does feel that he has somewhat less abdominal discomfort than previously. Specifically, he occasionally would have some very intermittent and mild shooting pains in his upper abdomen which he had attributed to the presence of his tumor. He notes that for the last several week he has not had any of these.

ASSESSMENT AND PLAN: The patient is a 69-year-old gentleman with multifocal unresectable cholangiocarcinoma, with the bulk of his tumor in the right lobe of his liver. He tolerated full-dose Xeloda extremely well without any significant side effects. He may be having some mild clinical benefit with a decrease of abdominal discomfort. He will receive course #2 based on a BSA of 2.0 of 4 pills b.i.d. for 14 days. He will start these on 02/05. At the end of February, he will undergo restaging evaluation and return to my clinic the first week in March. He should also continue his Lasix which is 20 mg p.o. q.o.d., and spironolactone 200 mg p.o. q.d.

[(Griggs' Exhibit No. 25I.]

33.     The Debtor gave Sterling Bank a written financial statement dated March 31, 2003, in which he represented that the value of his stock in the Company was $1,500,000.00. [Griggs' Exhibit No. 13.] The Debtor owned 100% of the stock of the Company on this date.

34.     Griggs worked at the Company up until April 12, 2003. He worked full-time in December of 2002, and in January and much of February of 2003. Thereafter, he worked part-time.

35.     On April 17, 2003, Griggs died. Mrs. Griggs was appointed the independent executrix of Griggs' estate. Mrs. Griggs is Griggs' sole heir.

36.     Upon Griggs' death, the Debtor became President of the Company.

37.     On June 30, 2003, the Note matured. At some point in June of 2003, the Debtor asked Mrs. Griggs to extend the maturity of the Note until March 31, 2004. When the Debtor asked Mrs.

Griggs to extend the maturity of the Note, the Debtor did not complain to her that her late husband had made any misrepresentations to him about his health. Mrs. Griggs agreed to the Debtor's request. The Debtor made some payments on the Note after Mrs. Griggs granted this extension request, but eventually stopped making the payments.

38.    The Debtor gave Sterling Bank a written financial statement dated August 31, 2003, in which he represented that the value of his stock in the Company was $4,200,000.00. [Griggs' Exhibit No. 13.] As of August 31, 2003, the Debtor owned 100% of the stock of the Company.

39.    On March 1, 2004, the Debtor stopped making payments on the Note. Prior to this date, the Debtor had made payments totaling $525,000.00. As of the date of the trial, July 6, 2006, the total amount of unpaid principal was $180,930.00, and the total amount of accrued unpaid interest was $43,423.20. Thus, the total amount of unpaid principal and accrued unpaid interest owed under the Note as of July 6, 2006, was $224,353.20.

40.    The Debtor gave Sterling Bank a written financial statement dated May 31, 2004, in which he represented that the value of his stock in the Company was $3,000,000.00. [Griggs' Exhibit No. 13.] As of May 31, 2004, the Debtor owned 100% of the Company.

41.    On July 29, 2004, Mrs. Griggs filed suit against the Debtor in District Court in Harris County, Texas to enforce the terms of the Note and the Stock Purchase Agreement (the State Court Lawsuit). [Adversary No. 06-3158, Docket No. 1, Exhibit No. A-1.]

42.    On August 30, 2004, the Debtor filed his Original Answer to Mrs. Griggs' Original Petition in the State Court Lawsuit. [Adversary No. 06-3158, Docket No. 1, Exhibit No. A-2.]

43.    On or about October 11, 2004, the appraisal firm of McClure, Schumacher & Associates, L.L.P. sent the Debtor, in his capacity as President of the Company, an appraisal of the value of the stock of the Company. [Debtor's Exhibit No. 18.] The transmittal letter and the appraisal itself both state that the value of the stock as of December 31, 2002, was $900,000.00. [Id., ¶4, 27]. At some point thereafter, McClure, Schumacher & Associates L.L.P. revised its appraisal and concluded that the fair market value of the Company as of December 31, 2002 was not $900,000.00, but rather in the range of $300,000.00 to $500,000.00.

44.    The Debtor gave Sterling Bank a written financial statement dated April 30, 2005, representing that the value of his stock in the Company was $3,000,000.00 [Griggs' Exhibit No. 13.] As of April 30, 2005, the Debtor still owned 100% of the stock of the Company. At the time that the Debtor gave this financial statement to Sterling Bank, the Debtor had already received the appraisal setting forth that the Company's value at $900,000.00 as of December 31, 2002.

45.    On or about February 6, 2006, the Debtor filed his Chapter 11 voluntary petition. [Case No. 06-30434, Docket No. 1.]

46.    On February 7, 2006, the Debtor removed the State Court Lawsuit to this Court. [Adversary No. 06-03158, Docket No. 1.] This suit was assigned Adversary Proceeding number 06-03158 (the Adversary Proceeding).

47.    On February 14, 2006, the Debtor filed a Counterclaim against Mrs. Griggs in the Adversary Proceeding. [Adversary No. 06-03158, Docket No. 5.]

9

48.  On February 15, 2006, Mrs. Griggs filed a Motion to Remand the State Court Lawsuit back to the Harris County District Court. [Adversary No. 06-03158, Docket No. 6.]

49.  On March 1, 2006, Mrs. Griggs, through her attorney, William C. Boyd (Boyd), filed her Proof of Claim for $180,930.00. [Claim No. 3.] She attached only the Note to her claim.

50.  On March 7, 2006, the Debtor filed a Response opposing the Motion for Remand in the Adversary Proceeding. [Adversary No. 06-03158, Docket No. 9.]

51.  On March 7, 2006, the Debtor also filed an Objection to Mrs. Griggs' Proof of Claim. [Case No. 06-30434, Docket No. 17.]

52.  On March 21, 2006, in the Adversary Proceeding, Mrs. Griggs filed her Answer to the Debtor's Counterclaim in the Adversary Proceeding. [Adversary No. 06-03158, Docket No. 12.]

53.  On March 22, 2006, in the Main Case, Mrs. Griggs filed her Response to the Debtor's Objection to her Proof of Claim. [Case No. 06-30434, Docket No. 25.]

54.  On March 27, 2006, this Court held a hearing on Mrs. Griggs' Motion for Remand, and this Court denied the Motion. An order to that effect was entered on the docket on the same day. [Adversary No. 06-03158, Docket No. 13.]

55.  On March 31, 2006, Turner wrote a letter to the Debtor setting forth, among other things, that Turner still had in his possession the 500 shares of the Company owned by Griggs that had been sold to the Debtor on December 6, 2002. [Griggs' Exhibit No. 18.] Turner concluded his letter by stating "I would be happy to deliver that certificate to you when you have completed the terms of the Stock Purchase Agreement and I have been advised by Mrs. Griggs that you have done so." *Id.*

56.  The claims register reflects that on April, 6, 2006, Mrs. Griggs, through her attorney, Boyd, filed an Amended Proof of Claim in the above referenced Chapter 11 case. In fact, no Amended Proof of Claim was filed.

57.  The Company continues to distribute written information about itself to the public. These materials about the Company include a profile of Griggs setting forth that he founded the Company. [Griggs' Exhibit No. 19.]

58.  Since he became a shareholder of the Company, the Debtor has had complete access to the Company's books and records.

59.  The Debtor testified that Griggs and he were "partners and trusting friends," and Griggs never did anything to undermine his integrity. The Debtor also testified that Griggs was an optimistic individual. Mrs. Griggs testified that her husband never thought that he would die so soon.

60.  The Debtor visited Griggs when Griggs was in the hospital.

61.  The Debtor testified that he does not know what Griggs was told by the physicians who treated and/or examined Griggs.

62.     The Debtor himself did no due diligence in November and December of 2002 with respect to any aspect of the stock sale, including conducting any investigation about the state of Griggs' health.

63.     The Debtor testified that he never reached any agreement with Griggs as to how long Griggs would continue to work at the Company after the December 6, 2002 stock sale.

64.     There is no evidence of any "key man" insurance. Accordingly, this Court finds no such insurance ever existed.

65.     There is no evidence of any $600,000.00 insurance policy. Accordingly, this Court finds no such insurance policy ever existed.

66.     There is no evidence that Griggs or Mrs. Griggs ever changed beneficiaries on any insurance policy. Accordingly, this Court finds that no such changes was ever made.

67.     The Debtor knew that Griggs did not pass his physical in April 2002, and the Debtor also knew that the insurance policy sought to be procured by the Debtor undergoing this physical was never procured. The Debtor knew these facts well in advance of the closing on the stock sale that took place on December 6, 2002.

68.     Boyd is counsel for Mrs. Griggs. He received his law degree from Texas Tech University in 1968, and has been practicing law for over 35 years. He has extensive experience trying lawsuits. His firm represents Mrs. Griggs on a contingency basis whereby his firm will receive 33 1/3% of the amount of any judgment awarded to Mrs. Griggs. Most of the cases handled by Boyd's firm are done on a similar contingency basis. As with most of its clients, Boyd's firm has no written agreement with Mrs. Griggs. Both Boyd and his firm have utmost trust in Mrs. Griggs, and believe that she will ensure that the 33 1/3% fee is paid out of any judgment awarded to her against the Debtor.

69.     Because Boyd's firm represents Mrs. Griggs under a contingency arrangement, Boyd has not sent Mrs. Griggs any monthly invoices, nor has he kept time sheets. Moreover, Boyd cannot segregate with precision the time that he has spent prosecuting the claim under the Note against the Debtor from the time that he has spent defending against the counterclaims brought by the Debtor. Boyd testified that prosecuting the claim and defending against the counterclaims are so intertwined that it is not easy to separate out the work. He estimates that 60-75% of his time has been spent prosecuting the claim and 25-40% of his time has been spent defending against the counterclaims. Boyd has spent in excess of 400 hours representing Mrs. Griggs in this lawsuit. In his opinion, $60,000.00 is a reasonable fee for this representation. If the appeal is taken to the District Court, Boyd believes that a reasonable fee for representing Mrs. Griggs on this appeal would be $7,500.00. If an appeal is thereafter taken to the Fifth Circuit, Boyd believes that a reasonable fee for representing Mrs. Griggs would be $5,000.00.

70.     Macon D. Strother (Strother), the Debtor's special counsel for this suit, testified that the value of his time for prosecuting the counterclaims and defending against Mrs. Griggs' claim totaled $53,000.00.

71.     If Boyd had taken on representation of Mrs. Griggs on an hourly basis, he would have billed $150.00 per hour when the suit was filed in 2004, and the rate would have been increased to $200.00 for services rendered in 2006.

11

### III. CONCLUSIONS OF LAW

#### A. Griggs did not owe a fiduciary duty to the Debtor.

The Debtor asserts that: (1) Griggs owed him a fiduciary duty; (2) Griggs violated this duty by failing to make sufficient disclosure to the Debtor about his cancer; and (3) the Debtor has suffered damages by virtue of having purchased Griggs' stock for $750,000.00 believing that a healthy Griggs would continue to work at the Company for many years to come.

This Court finds that Griggs did not owe the Debtor a fiduciary duty. Generally, "[a] fiduciary duty requires the fiduciary to place the interest of the other party before his or her own." *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593-94 (Tex. 1992); *Hallmark v. Port/Cooper-T Smith Stevedoring Co.*, 907 S.W.2d 586, 592 (Tex. App.—Corpus Christi 1995, no writ)). In Texas, there are two classifications of fiduciary relationships: "[1] a formal fiduciary relationship that arises as a matter of law, such as principal/agent or partners[;] and [2] an informal fiduciary relationship arising from a confidential relationship 'where one person trusts in and relies upon another, whether the relation is moral, social, domestic or merely personal.'" *Hoggett*, 971 S.W.2d at 487 (quoting *Crim Truck & Tractor Co.*, 823 S.W.2d at 593-94; *Hallmark*, 907 S.W.2d at 592). Fiduciary relationships are unique and not easily conferred; "the mere fact that one subjectively trusts another does not alone indicate that confidence is placed in another in the sense demanded by fiduciary relationships because something apart from the transaction between the parties is required." *Hoggett*, 971 S.W.2d at 488 (citing *Kline v. O'Quinn*, 874 S.W.2d 776, 786 (Tex. App.—Houston [14th Dist.] 1994, writ denied), *cert. denied*, 515 U.S. 1142, 115 S. Ct. 2579, 132 L. Ed. 2d 829 (1995)). Typically, "whether such a duty exists depends on the circumstances." *Hoggett*, 971 S.W.2d at 488 (citing *Kaspar v. Thorne*, 755 S.W.2d 151, 155 (Tex. App.—Dallas 1988, no writ); *Schoellkopf v. Pledger*, 739 S.W.2d 914, 920 (Tex. App.—Dallas 1987), *rev'd on other grounds*, 762 S.W.2d 145 (Tex. 1988)).

12

With respect to a formal fiduciary relationship, a corporate officer's fiduciary duty generally runs only to the corporation and not to individual shareholders. *Hoggett*, 971 S.W.2d at 487-88. In *Hoggett v. Brown*, both parties were directors and shareholders of the company; nevertheless, the court held that there was no formal fiduciary relationship. 971 S.W.2d at 488. The court explained that "a co-shareholder in a closely held corporation does not as a matter of law owe a fiduciary duty to his co-shareholder." *Hoggett*, 971 S.W.2d at 488 (citing *Kaspar*, 755 S.W.2d at 155; *Schoellkopf*, 739 S.W.2d at 920). [1]

In this dispute, Griggs and the Debtor were co-shareholders because they each owned fifty percent of the Company's stock. (Griggs' Exhibit No. 17.) The Company was closely held because Griggs and the Debtor were the only shareholders and each held the same amount of stock. *See Hoggett*, 971 S.W.2d at 488. There was no formal fiduciary relationship between Griggs and the Debtor on account of their co-shareholder relationship. *Id.* This conclusion holds true even though Griggs and the Debtor were the only officers and directors of the Company. (Debtor's Exhibit No. 1.) Griggs owed a fiduciary duty only to the Company, not the Debtor. *Hogget*, 971 S.W.2d at 488.

An informal fiduciary relationship arises when "influence has been acquired and abused, [and] confidence has been reposed and betrayed." *Crim Truck & Tractor Co.*, 823 S.W.2d at 594. Further, "it exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interest of the one reposing confidence." *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980). Merely because a relationship has been cordial and of long duration does not necessarily amount to a confidential relationship. *Hoggett*, 971 S.W.2d at 488 (citing *Crim Truck & Tractor Co.*, 823 S.W.2d at 594; *Hallmark*, 907 S.W.2d at 592). "The existence of a confidential relationship is a question of fact, but becomes a question of law if the issue is one of no evidence." *Crim Truck & Tractor Co.*, 823 S.W.2d at 594. Therefore, a fiduciary duty only arises from a confidential

---

[1] *See generally Hadj v. Soussan*, No. 01-98-01017-CV, 2001 Tex. App. LEXIS 2033(Tex. App.—Houston [1st Dist.] Mar. 29, 2001, no pet.) (opinion not designated for publication) (this case has almost identical facts and found that no fiduciary duty was created between equal shareholders of a closely held corporation).

relationship when the evidence shows that: (1) influence was acquired and then abused; and (2) the confidence was reposed and betrayed.

In the suit at bar, Griggs and the Debtor did not have an informal confidential relationship giving rise to a fiduciary duty. Although there is evidence that the Debtor and Griggs had a relationship of trust and confidence in each other, the Debtor has not established that there was influence or an abuse of influence in the relationship. [Finding of Fact No. 59.] Indeed, as equal shareholders and officers of the company, Griggs and the Debtor were responsible for different but equally important aspects of the Company. [Findings of Fact Nos. 4, 5.] Griggs was responsible for developing clients, and the Debtor was in charge of designing and constructing the exhibits; there was no evidence that Griggs exercised influence over the Debtor in business operations. [Findings of Fact Nos. 4, 5, 6.] Further, there is no evidence that confidence was betrayed because, after the stock sale, the Company continued to disseminate positive information about Griggs. [Finding of Fact No. 57.] Additionally, confidence was not betrayed because as a 50% shareholder and officer of the Company, the Debtor had complete access to the books and records of the Company at all times during the negotiations. [Finding of Fact No. 58.] Indeed, as early as April of 2002, the Debtor had concluded on his own that the value of Dr. Griggs' stock was $750,000.00 [Finding of Fact No. 14.] Finally, there was no confidence betrayed because the Debtor failed to conduct his own due diligence to ensure the December 6, 2002 transaction was fair. [Finding of Fact No. 62.] Because the evidence does not reflect that Griggs' confidential relationship with the Debtor resulted in an abuse of influence and a betrayal of confidence, no fiduciary duty was created.

Even if this Court is incorrect and Griggs did owe a fiduciary duty to the Debtor, Griggs did not breach this duty. There is no evidence that Griggs exerted an abuse of influence or betrayed any trust when both men were equal shareholders with equal access to the Company's books and records. [Findings of Fact Nos. 4, 58.]

Moreover, even if this Court is incorrect and there was a breach of a fiduciary duty, the Debtor failed to prove that he sustained an injury. The evidence shows that prior to the death of

14

Griggs, the Company's stock was worth $1,500,000.00, and over four months after the death of Griggs, the Company's stock was worth $4,200,000.00. [Findings of Fact Nos. 33, 35, 38.]

Finally, even if this Court is incorrect and the Debtor did suffer damages, the alleged breach of duty was not the proximate cause of these damages because there was an intervening cause. According to the testimony of Mr. Schumacher, an appraiser from McClure, Schumacher & Associates, in addition to the death of Griggs, the loss of the Shell Oil Company contract was a major reason for the low appraisal value of the Company for the year 2002. [Findings of Fact Nos. 9, 43.]

### B. Griggs and his wife did not conspire against the Debtor.

The Debtor next asserts that Griggs and his wife conspired to deceive him into purchasing the shares of stock owned by Griggs for the sum of $750,000.00. This Court disagrees.

To prove a civil conspiracy in Texas, a plaintiff must satisfy the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Murray v. Earle*, 405 F.3d 278, 293 (5th Cir. 2005) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).

The thrust of a civil conspiracy cause of action "is the injury that is intended to be caused." *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 720 (Tex. 1995) (citing *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex. 1968)). A person cannot commit a civil conspiracy unless he knows of and agrees to a wrongful act. *Triplex Commc'ns, Inc.*, 900 S.W.2d at 720 (citing *Schlumberger Well Surveying Corp.*, 435 S.W.2d at 857). Thus, "one without knowledge of a conspiratorial plan or scheme to injure another by the commission of a particular wrong cannot share the intent to injure such other." *Schlumberger Well Surveying Corp.*, 435 S.W.2d at 857. Additionally, the Texas Supreme Court has stated that "proof of a conspiracy may be, and usually must be made by circumstantial evidence." *Id.* at 858 (citing *Jernigan v. Wainer*, 12 Tex. 189 (1854)). However, "a vital fact may not be established by piling inference upon

15

inference." *Id.* (citing *Rounsaville v. Bullard*, 276 S.W.2d 791, 793-94 (1955); *Lobley v. Gilbert*, 236 S.W.2d 121, 123-24 (1951)).

In the suit at bar, the first element is met because there are two persons alleged to have conspired: Mrs. Griggs and Griggs. The second element also appears to be satisfied because there was a goal to accomplish: for Griggs to sell his stock to the Debtor. However, the third element is not supported by the evidence. There is no evidence that Mrs. Griggs and Griggs had a meeting of the minds about Griggs selling his stock for $750,000.00 to the Debtor because there is no proof that Mrs. Griggs attended the negotiations between Griggs and the Debtor or knew about the letter to Turner or the terms of the Stock Purchase Agreement. [Findings of Fact Nos. 7, 8, 14, 26, 28.] The fourth element is also not satisfied because there is no evidence that Mrs. Griggs committed any overt acts to deceive the Debtor, such as making statements to the Debtor about Griggs only having spots on his liver or stating that her husband was in remission.[2] [Findings of Fact Nos. 23, 27.] Additionally, Mrs. Griggs did not attend the M.D. Anderson Cancer Center appointments with Griggs [Findings of Fact Nos. 15, 18, 19, 22, 24, 30, 32.] Finally, the fifth element fails because the Debtor failed to demonstrate that he sustained any damages as a result of overt acts committed by Mrs. Griggs: as discussed above, the Debtor's own financial statements following the death of Dr. Griggs reflect that the value of the Debtor's stock in the Company rose substantially.

Additionally, aside from a lack of direct evidence, there is no circumstantial evidence to support elements three and four. Therefore, this Court holds that there was no civil conspiracy between Griggs and Mrs. Griggs because elements three through five are not met.

### C. Griggs did not commit statutory fraud with respect to the Debtor.

The Debtor next asserts that Griggs committed statutory fraud against him. This Court disagrees and finds that Griggs did not commit statutory fraud against the Debtor. Under Texas law:

(a)     Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

---

[2] There is also no evidence that Mrs. Griggs was aware that her husband had made any such statements to the Debtor.

(1)    false representation of a past or existing material fact, when the false representation is

        (A)    made to a person for the purpose of inducing that person to enter into a contract; and

        (B)    relied on by that person in entering into that contract; or

(2)    false promise to do an act, when the false promise is

        (A)    material;

        (B)    made with the intention of not fulfilling it;

        (C)    made to a person for the purpose of inducing that person to enter into a contract; and

        (D)    relied on by that person in entering into that contract.

TEX. BUS. & COM. CODE § 27.01 (Vernon 2005).

### 1. False representation of a past or existing material fact

### (i) Griggs made no false misrepresentations of a material fact.

The first element of statutory fraud under Texas law is that a false representation of a past or existing fact be material. Under Texas law, a representation is not material if it is "vague and indefinite in its nature and terms." *Georgen-Saad v. Tex. Mut. Ins. Co.*, 195 F. Supp. 2d 853, 861 (W.D. Tex. 2002) (quoting *Putman v. Bromwell*, 73 Tex. 465, 468, 11 S.W. 491, 492 (1889)). In *Georgen-Saad v. Tex. Mut. Ins. Co.*, the plaintiff alleged that her employer discriminated against her based on gender. 195 F. Supp. 2d at 856. The plaintiff claimed that the employer stated "he was 'trying' to get her a raise" and that "she would get 'credit' for her work." *Id.* at 861. Regarding the fraud claim, the court determined the statements made by the employer were not sufficiently specific to constitute fraudulent misrepresentations. *Id.* The employer's statement that he was "trying" to get the plaintiff a raise did not suggest he promised the plaintiff would actually receive a raise. *Id.* Moreover, the court in *Georgen-Saad* found that "credit" can be interpreted to mean anything, including telling her she was going to get credit (a self-fulfilling statement), "a bag of dried mangos, a gold star on her paycheck, a nice jazz CD, a piece of paper with 'credit' written on it, or a raise." *Id.* Because the statements made by the employer were vague and indefinite, the court found that the plaintiff failed to show that the representations were material. *Id.*

17

As in *Georgen-Saad*, the Debtor has failed to carry his burden of proving that Griggs' representations to the Debtor were material. *See id.* In September of 2002, Griggs told the Debtor that he (i.e., Griggs) had a few spots on his liver. [Finding of Fact No. 23.] In late November or early December of 2002, Griggs told the Debtor that his cancer was in remission and that he was through with his chemotherapy. [Finding of Fact No. 27.] Like the statements in *Georgen-Saad*, the statements that Griggs made to the Debtor were vague and indefinite, particularly given the circumstances in which the Debtor contends that Griggs' statements led him to believe that Griggs had cancer but had fully recovered and would live for many more years. "A few spots" does not specifically, or even indirectly, indicate how benign or lethal the cancer could be. Moreover, "remission" and "through with chemotherapy" by no means indicate that Griggs was completely cured of his cancer. The statements by Griggs are at best either "puffing" or opinion statements and therefore cannot be the basis of a fraud claim because they are not inherently false and, due to their nature, are not material. *Larsen v. Langford*, 41 S.W.3d 245, 252 (Tex. App. — Waco 2001, pet. denied). One interpretation of these statements could well be that Griggs' condition had improved since the initial diagnosis of the cancer, but such a conclusion does not come within hailing distance of reasonably concluding that Griggs was completely cured and would live many more years. If Griggs had specifically told the Debtor that he was completely cured of cancer, the representation could be considered material; however, his statement fell far short of such a representation.

> **(ii) Even if this Court is incorrect and Griggs did make material representations that were false, these false representations were not made for the purpose of inducing the Debtor to enter into the Stock Purchase Agreement.**

The second element of statutory fraud under Texas law is that the false representation be made for the purpose of inducing that person to enter into a contract. "A result is intended if an actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct." RESTATEMENT (SECOND) OF TORTS § 8A (1965). There is insufficient evidence to show that Griggs made the representations for the purpose of inducing the

Debtor to enter into the Stock Purchase Agreement. Griggs could have made the statements over a casual conversation between long-time friends and business colleagues completely outside of any negotiations about the sale of stock. In addition, the Debtor failed to prove that Griggs was substantially certain that his statements would be the cause of the Debtor's decision to enter into the Stock Purchase Agreement. The Debtor had previously approached Griggs about a stock sale. So, before Griggs made any representations, the Debtor was already interested in purchasing Griggs' stock. [Findings of Fact Nos. 7, 8.] The evidence described above, taken as a whole, is insufficient to show that Griggs made the statements regarding his medical condition in order to induce the Debtor to enter into the Stock Purchase Agreement.

### (iii) Even if this Court is incorrect and Griggs made material misrepresentations to induce the Debtor to enter into the Stock Purchase Agreement, the Debtor did not justifiably rely on the statements.

The third element of statutory fraud under Texas law is reliance. Reliance on a fraudulent misrepresentation must be justifiable. *Bykowicz v. Pulte Home Corp.,* 950 F.2d 1046 (5th Cir. 1992) (holding that justifiable reliance is the applicable standard under the Texas Business and Commerce Code § 27.01)). Reliance is not justifiable if the defendant "blindly relies upon misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Lewis v. Bank of Am. NA,* 343 F.3d 540, 546 (5th Cir. 2003) (quoting *Field v. Mans,* 516 U.S. 59, 71, 116 S. Ct., 133, 437 L. Ed. 2d 351 (1995) (citing RESTATEMENT (SECOND) OF TORTS § 541, cmt. a (1977) (applying the justifiable reliance standard in considering fraud under 11 U.S.C. § 523(a)(2) (2006)). In *Lewis,* the plaintiff alleged he was induced by the bank to withdraw funds from his account. *Id.* at 545. The plaintiff alleged that a banker informed him there would be certain tax benefits if he transferred the funds. *Id.* However, the context regarding the bank's representation to the plaintiff about the effect of his transfer was not clear. *Id.* at 546. There was no evidence that the plaintiff perceived the banker as a tax expert. *Id.* at 547. The plaintiff received forms and documents, none of which indicated his transfer as tax-deferred. *Id.* The plaintiff had a business background and access to professional accountants. *Id.* Based on these

19

circumstances, the court found that Lewis blindly transferred $600,000.00 and did not justifiably rely on the bank's representation. *Id.* The court found that there were "red flags" that should have led the plaintiff to conduct a further investigation. *Id.*

Even if Griggs did make false representations regarding his health, the Debtor did not justifiably rely on these representations. In August of 2002, Griggs told the Debtor that he (i.e., Griggs) was ill. [Finding of Fact No. 20.] In September of 2002, Griggs told the Debtor that he (i.e., Griggs) had a few spots on his liver. [Finding of Fact No. 23.] In late November or early December of 2002, Griggs told the Debtor that his cancer was in remission and that he was through with his chemotherapy. [Finding of Fact No. 27.] Considering that the Debtor knew Griggs had been diagnosed with cancer earlier in the year [Finding of Fact No. 16], had undergone chemotherapy, was not a medical expert [Finding of Fact No. 27], and was crucial to the Company's future success [Finding of Fact No. 6], the Debtor did not justifiably rely on Griggs' alleged false statements. As in *Lewis*, the Debtor blindly relied on Griggs' representations. *See Lewis*, 343 F.3d at 547. Also, as in *Lewis*, there were "red flags" regarding the Debtor's health that should have prompted the Debtor to conduct his own investigation. *Id.* For example, the Debtor could have asked Griggs to allow the Debtor's physician to confer with Griggs' physician about the prognosis for Griggs' cancer. Or, the Debtor could have directly asked Griggs if his doctors had expressly told him that he was completely cured. Or, the Debtor could have asked Griggs if his doctors had given him written reports regarding his prognosis and, if so, whether Griggs would consent to the Debtor reviewing these reports. The Debtor took none of these steps or, for that matter, any other steps that a reasonable person would have taken before agreeing to pay $750,000.00 to purchase the stock of a person whose continued good health and employment at the Company were crucial to the success of the business and therefore to the value of the stock being purchased.

### 2. False promise to do an act

Griggs did not make a false promise to do an act. The Debtor argues that Griggs made a false promise of future performance when Griggs promised to continue working for the Company

20

subsequent to the Debtor's purchase of his (i.e., Griggs') shares. [Debtor's Exhibit No. 6.] To prove an affirmative misrepresentation based on a false promise of future performance, the Debtor must show that (1) Griggs made a material promise of future performance; (2) Griggs had no intention of performing that promise when he made it; (3) Griggs made the promise with the purpose of inducing the Debtor to enter into the Stock Purchase Agreement; and (4) the Debtor relied on the promise when entering the Stock Purchase Agreement. TEX. BUS. & COM. CODE § 27.01. The promise of future performance was material, as it was part of the Stock Purchase Agreement made between Griggs and the Debtor. However, there is insufficient evidence to conclude that when the promise was made, Griggs did not intend to perform to the best of his abilities. Rather, according to the evidence, Griggs, as promised, continued to work at the Company. Indeed, after he sold his stock on December 6, 2002, Griggs worked full-time for the rest of December 2002 and in January and much of February of 2003. [Findings of Fact Nos. 28, 34.] Thereafter, he worked part-time up until April 12, 2003–only five days before his death. [Findings of Fact Nos. 34, 35.] Such evidence demonstrates to this Court that Griggs had a genuine intention to perform the promise he made to the Debtor at the time of the stock sale. Griggs made the promise to stay and work at the Company, and the Debtor relied on the promise. However, contrary to the Debtor's contention that Griggs reneged on his promise, Griggs worked diligently until his death. By his actions, Griggs made every effort to fulfill his promise, and these efforts now preclude the Debtor from prevailing on his claim of a statutory fraud.

> **3.     Even if this Court is incorrect and Griggs made material representations to induce the Debtor to enter into the Stock Purchase Agreement, which the Debtor justifiably relied upon, and Griggs made a false promise of future performance, the Debtor has still failed to prove that he has incurred any damages as a result of purchasing Griggs' stock.**

As discussed in Section A, this Court has concluded that the Debtor has not suffered any injury as a result of the stock sale. Indeed, according to the Debtor's own financial statements, the Debtor's net worth actually grew significantly after Griggs' death due to an increase in the value of the stock of the Company, 100% of which the Debtor owned at the time of the delivery of his

financial statements to Sterling Bank. Accordingly, even if Webber has satisfied all of the other elements of statutory fraud, Webber's failure to prove any damages leads this Court to conclude that Webber is entitled to no relief.

**D. Griggs did not commit common law fraud with respect to the Debtor.**

The Debtor next contends that Griggs committed common law fraud against him. This Court disagrees. Under Texas law, the elements of common law fraud are as follows:

> (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Flourine on Call Ltd. v. Flourogas Ltd.*, 380 F.3d 849, 858 (citing *Coffel v. Stryker Corp.* 284 F.3d 625, 631 (5th Cir., 2002) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W. 2d 41, 47 (Tex. 1998)). Each element of fraud must be proven by a preponderance of evidence. *Martin v. MBank El Paso, N.A.*, 947 F.2d 1278, 1280 (5th Cir. 1991).

**1. False representation of a past or existing material fact**

**(i) Material misrepresentation**

First, the Debtor must show that Griggs made a material misrepresentation. *Flourine,* 380 F.3d at 858. This Court, in applying the material misrepresentation element of statutory fraud, concluded that Griggs did not make a material misrepresentation to the Debtor. The same conclusion can be drawn with respect to common law fraud.

**(ii) False representations**

Assuming that this Court is incorrect and Griggs did make one or more material misrepresentations, the Debtor must still show that the representations were false at the time they were made. *Flourine*, 380 F.3d at 858. In September of 2002, Griggs told the Debtor he had a few spots on his liver. [Finding of Fact No. 23.] However, Griggs met with his oncologist earlier on June 27, 2002, and according to the doctor's written reports, the "tumor [was] quite extensive in the liver." [Finding of Fact No. 19.] In late November or early December 2002, Griggs also stated his cancer was in remission and that he had completed his chemotherapy. [Finding of Fact No. 27.]

Yet, Griggs actually underwent his last chemotherapy treatment in December of 2002. [Finding of Fact No. 29.] Based on this evidence, Griggs' statements regarding his health were false.

### (iii)  Knowledge of falsity

Assuming that Griggs made material misrepresentations to the Debtor about his health and that these misrepresentations were false at the time Griggs made them, the Debtor must prove that Griggs knew his representations were false or, in the alternative, that Griggs made the statements without knowledge of their truth. *Flourine*, 380 F.3d at 858 (citing *Coffel*, 284 F.3d at 631 (citing *Formosa*, 960 S.W.2d at 47)).  The Debtor has not satisfied his burden of proof on this element. According to the physician's notes, Griggs had a "small to moderate volume disease" which was "stable" and he "tolerated this chemotherapy extremely well." [Findings of Fact Nos. 24, 30.] The doctors found Griggs to appear to be in generally good health. [Finding of Fact Nos. 18, 22, 24, 30, 31; *see* Griggs' Exhibits Nos. 25A, 25D, 25F, 25H, and 25I.] The Debtor also testified that Griggs was an optimistic individual. [Finding of Fact No. 59.] Although he was fatigued, the doctor's reports show that Griggs suffered no nausea, vomiting, abdominal pain, mucositis, or fever/chills, and also experienced no change in bowel or bladder habits.  [*See, e.g.*, Finding of Fact No. 30.] Griggs continued to work nearly full-time as a consultant and museum exhibit designer while he underwent chemotherapy.  *Id.*   Additionally, this Court did not receive evidence or hear any testimony discussing what Griggs' oncologist actually told him about his specific prognosis.[3] These facts suggest that at the time Griggs made the statements to the Debtor, he believed that he was going

---

[3] The evidence does show that the oncologist told Griggs that, statistically, patients afflicted with this specific type of cancer live, on average, approximately 15 months. (Debtor's Exhibit No. 21, p.143.) The Debtor asserts that Griggs' failure to inform the Debtor of this information was a material omission that Griggs knowingly concealed.  This Court disagrees.  Griggs, who, by the Debtor's own testimony, was an optimistic person, was focused not on the statistical patient, but on himself.  His optimistic view of the world, combined with the fact that the written reports could be construed to reflect that the chemotherapy was producing positive results, led Griggs to conclude that he would survive.  Indeed, all of the physicians' reports reflect that Griggs was in excellent physical health aside from this one affliction [Finding of Fact Nos. 18, 22, 24, 30, 31; *see* Griggs' Exhibit Nos. 25A, 25D, 25F, 25H, and 25I.] It is quite reasonable to conclude that an optimistic person who is in excellent health would not believe that he is going to die, particularly when he is being treated by capable physicians and is able to continue to work full-time, which was the case right up to the stock sale and for three months thereafter.

to live, not die. Therefore, when he made the statements to the Debtor, he believed them to be true.

### (iv) Intent

Even if the Debtor has satisfied the first three elements of common law fraud, to prove an action for fraudulent misrepresentation, the Debtor must also establish that Griggs intended for the Debtor to rely on the representations and go forward with the stock purchase. *Flourine,* 380 F.3d at 858 (citing *Coffel,* 284 F.3d at 631 (citing *Formosa,* 960 S.W.2d at 47)). To prove intent, the Debtor must show that Griggs either intended, or had "reason to expect", that the Debtor would act in reliance on the representations. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 - 78 (Tex. 2001) (citing RESTATEMENT (SECOND) OF TORTS § 531 (1977)). The Debtor testified that Griggs made representations about his cancer, but the Debtor failed to prove that Griggs made these representations in conjunction with negotiations between these two individuals about the stock sale. Given the relationship between these two individuals, this Court can easily envision that Griggs' statements were made in normal nonchalant conversation with the Debtor, as opposed to being made during purposeful negotiations over the stock sale where the Debtor was quizzing Griggs about his health. This distinction is important. It is one thing to make a statement about one's health in negotiations over a stock sale when specifically asked about this topic; the speaker would surely hope that the listener would rely on the answer in deciding to consummate the transaction. It is quite another to casually comment about one's most recent health malady in conversation between friends who work together; the speaker would not be inclined to believe that the listener would rely on any such statements in deciding to go forward with a substantial business transaction. The Debtor's testimony gave no indication under what circumstances Griggs made these statements to him. Because there is insufficient evidence to show that Griggs intended, or had reason to expect, that the Debtor would act in reliance on his representations and purchase his stock in the Company, the Debtor has failed to meet his burden to prove this element.

### (v) Justifiable reliance

Even if the Debtor has satisfied the first four elements, common law fraud requires the Debtor to show not only that a misrepresentation was made, but that he also justifiably relied on the alleged misrepresentation. *Ernst & Young L.L.P.,* 51 S.W.3d at 577 (citing RESTATEMENT (SECOND) OF TORTS § 531 (1977)). The Debtor claims that when he bought the stock, he justifiably relied on Griggs' representations that Griggs was in remission and would be working for the Company far into the future. The "justifiable reliance" element of common law fraud does not require the Debtor to demonstrate reasonableness. *Martin,* 947 F.2d at 1280. However, as previously noted, the Debtor "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Lewis,* 343 F.3d at 546 (citations omitted). This Court, in applying the justifiable reliance element of statutory fraud, has concluded that the Debtor did not justifiably rely on Griggs' representations. The same conclusion can be drawn with respect to common law fraud. The Debtor should have investigated the veracity and accuracy of Griggs' representations. His failure to do so leads this Court to conclude that even if the Debtor relied upon Griggs' representations, his reliance was not justifiable.

### 2. Even if this Court is incorrect and the Debtor has satisfied the first five elements of common law fraud, the Debtor has failed to prove that he suffered damages.

As discussed in Section A, this Court has concluded that the Debtor has not suffered any injury as a result of the stock sale. Indeed, according to the Debtor's own financial statements, the Debtor's net worth actually increased significantly after Griggs' death due to an increase in the value of the stock of the Company, 100% of which the Debtor owned at the time of the delivery of his financial statements to Sterling Bank. Accordingly, even if the Debtor has satisfied all of the other elements of common law fraud, his failure to prove any damages leads this Court to conclude that the Debtor is entitled to no relief.

**E. Even if the Debtor has satisfied all of the elements of one or more of his claims, one of the affirmative defenses that Mrs. Griggs raises bars the Debtor from recovery.**

### 1. Duty to inquire

The Debtor had a duty to inquire into Griggs' health condition. "Failure to use due diligence to suspect or discover someone's fraud will not act to bar the defense of fraud to the contract." *Koral Indus. v. Sec.-Conn. Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990) (citing *Plains Cotton Coop. Ass'n v. Wolf*, 553 S.W.2d 800 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.) (citing *Houston v. Howe & Wise*, 373 S.W.2d 781 (Tex. Civ. App.—Houston [1st Dist.] 1963, writ ref'd n.r.e.))). However, a duty to inquire is created when "such information is known as would prompt a person exercising reasonable care to acquire knowledge of the fact in question. When those inquiries are not made, the person is chargeable with knowledge that would have been acquired through diligent inquiry." 58 AM JUR 2D *Notice* § 13 (2006).

In *Flack v. First Nat'l Bank of Dalhart*, 226 S.W.2d 628, 630 (Tex. 1950), the bank loaned money to Mr. Walton, and in return Mr. Walton offered 247 cows as security. However, Mr. Walton did not own eighty-six of the cows offered as security. *Id.* When Mr. Woods, the president of the bank, inspected the eighty-six cows he discovered the cows were not branded with Mr. Walton's brand. *Id.* Nevertheless, he gave Mr. Walton a loan with the cows serving as security. *Id.* Petitioners subsequently sold the eighty-six cows to Mr. Walton. *Id.* at 631. Petitioners sued the bank, claiming their contracted rights with Mr. Walton had priority over any lien rights on the cattle. *Id.* The Supreme Court of Texas reasoned that:

> [K]nowledge will be imputed and may be implied from circumstances where the circumstances known to one concerning a matter in which he is interested are sufficient to require him, as an honest and prudent person, to investigate. . . , and diligent investigation will lead to discovery of any right conflicting with his own.

*Id.* at 632 (citing 4 TEX. JUR., 362-365 (date unspecified)) (Updated 54 TEX. JUR. *Notice* § 6). Using this reasoning, the court found Mr. Woods had notice of the fact that Mr. Walton did not own the eighty-six cows. *Id.* A prudent man, upon finding that the cows lacked Mr. Walton's brand, would have further investigated whether or not Mr. Walton in fact owned the cows. *Id.* at 632. In addition,

Mr. Woods was aware of other factors that would have led one to further investigate into whether Mr. Walton owned the eighty-six cows. *Id.*

In the suit at bar, the Debtor knew Griggs had cancer and had undergone chemotherapy. [Findings of Fact Nos. 20, 23, 27.] Thus, like the situation in *Flack*, the Debtor was aware of certain facts key that were sufficient to require him to investigate Griggs' health, which was a matter of high interest given Griggs' importance to the Company. The Debtor could have asked Griggs if he (i.e., the Debtor) could speak with the physicians who were treating Griggs in order to learn more about Griggs' health. The Debtor could have also asked Griggs himself if he (i.e., Griggs) was sure that his cancer was in remission. Finally, the Debtor could have asked Griggs if his doctors had given him any prognosis as to how long he would live (as opposed to the statistics of how long, on average, a patient with this type of cancer would survive). By failing to inquire into Griggs' condition when a prudent person would have done so, the knowledge of Griggs' actual condition at the time of the Stock Purchase Agreement is imputed to the Debtor. "Means of knowledge, with the duty of using them, are thus deemed the equivalent of knowledge itself." *Flack*, 226 S.W.2d at 632 (citing 31 TEX. JUR. § 4 (date unspecified)) (Updated 54 TEX. JUR. *Notice* § 6). Consequently, the Debtor cannot claim he was defrauded by Griggs' statement about his condition. In addition, justifiable reliance and duty to investigate are closely intertwined. *Lo Frese v. Hayes*, 240 F.2d 277 (5th Cir. 1957). In *Lo Frese v. Hayes*, Mrs. Frese purchased property without procuring a survey. *Id.* at 278. She viewed the property, but was not shown the east boundary along the highway. *Id.* Two years after the conveyance of the property, it was discovered that the motel buildings, filling station, and part of a restaurant located on the purchased property were on the highway right of way. *Id.* The plaintiff sought to rescind the contract, claiming the agent's representations about the property were fraudulent. *Id.* The court reasoned that:

> [E]very person must use reasonable diligence for his own protection. Under any standard of conduct, and in the absence of accompanying actual deception, artifice, or misconduct, it is well agreed that where the means of knowledge are at hand and are equally available to both parties, and the subject matter is equally open to inspection, if one of them does not avail himself of those means . . . he will not be heard to say that he was deceived by the other's misrepresentations.

27

*Id.* at 281 (quoting 23 AM. JUR. 960, *Fraud and Deceit* § 155 (year unspecified)) (updated in 37 AM. JUR. 2D *Fraud and Deceit* § 266 (2006)). Based on this reasoning, the court found that Mrs. Frese failed to exercise reasonable diligence. *Id.* at 282. She could have procured a survey before entering into the real estate agreement to ascertain the exact boundaries of the purchased property. *Id.* at 279. There was no actual deception on the part of the real estate agent, and there was nothing preventing Mrs. Frese from acquiring information about the land she sought to purchase. *Id.* Consequently, the court found that Mrs. Frese did not safeguard her interest. *Id.* at 282.

As in *Hayes*, there was no actual deception on the part of Griggs and nothing preventing the Debtor from investigating Griggs' health. *Hayes*, 240 F.2d at 279. Considering the importance of Griggs to the Company, and therefore to the Debtor's own personal financial well-being, the Debtor should have undertaken his own investigation into Griggs' health in order to safeguard his own interest in the Company. By not investigating before entering into the Stock Purchase Agreement, the Debtor failed to "avail himself of those means and opportunities" available to him to find out the truth about Griggs' condition. *Hayes*, 240 F.2d at 281. Thus, the Debtor cannot claim he was defrauded by Griggs.

### 2. Statute of Limitations

The statute of limitations in Texas for fraud and breach of fiduciary duty is four years. TEX. CIV. PRAC. & REM. CODE § 16.004(a) (Vernon 2005). The statute of limitations period for fraud begins to run from the time the fraud is discovered or could have been discovered "by the exercise of reasonable diligence." *Little v. Smith*, 943 S.W.2d 414, 420 (Tex. 1997) (citing *Ruebeck v. Hunt*, 176 S.W. 2d 738, 739 (1944). The statute of limitations period for breach of fiduciary duty begins to run from the time "the claimant knew or should have known of facts that in the exercise of reasonable diligence would have led to discovery of the wrongful act." *Little*, 943 S.W.2d at 420 (citing *Slay v. Burnett Trust*, 187 S.W. 2d 377, 394 (1945)).

The Debtor brought his counterclaims on February 14, 2006. [Finding of Fact No. 47.] Four years earlier, on February 14, 2002, Griggs had not even taken his physical yet. [Finding of Fact No.

13.] Therefore, it is impossible for the Debtor to have discovered any facts related to Griggs'
physical examination prior to February 14, 2002. Because, as of February 14, 2002, the Debtor
could not have known of any facts that would lead to the discovery of fraud or breach of fiduciary
duty, the Court finds that the Debtor is not barred by the applicable limitations in bringing his
counterclaims.

### 3. Equitable estoppel

According to Texas law as applied by the Fifth Circuit, five elements must be satisfied for
an affirmative defense of equitable estoppel to prevail. *Med. Care Am., Inc. v. Nat'l Union Fire Ins.
Co.*, 341 F.3d 415, 422 (5th Cir. 2003). Those elements are: "(1) a false representation or
concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3)
with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining
knowledge of the facts; (5) who detrimentally relies on the representations." *Id.* (quoting *Johnson
& Higgins v. Kenneco Energy*, 962 S.W. 2d 507, 515-16 (Tex. 1998)). Further, "[t]he burden of
proving an estoppel and the essential elements thereof is on the party asserting it and the failure to
prove any one or more of the elements is fatal." *Med. Care Am. Inc.*, 341 F.3d at 422 (quoting
*Barfield v. Howard M. Smith of Amarillo*, 426 S.W. 2d 834, 838 (Tex. 1968)). Therefore, the burden
is on Mrs. Griggs to prove each element of equitable estoppel because she is the party asserting this
affirmative defense.

### (i) A false representation or concealment of material facts

"Estoppel by silence" satisfies the first element of equitable estoppel if the Debtor intended
to sue Griggs' probate estate and concealed that material fact from Mrs. Griggs on the day he asked
for the extension of the Note. *Casa El Sol-Acapulco, S.A. v. Fontenot*, 919 S.W.2d 709, 718 (Tex.
App.—Houston [14th Dist.] 1996, writ dism'd by agr.). Specifically, the Debtor failed to tell Mrs.
Griggs that her late husband had told him that his cancer was in remission, a statement which, in the
wake of Griggs' death, the Debtor knew, or should have known, was incorrect.

Further, "[e]stoppel by silence arises only if a person is under a duty to speak, but refrains from doing so and thereby leads another to act in reliance on a mistaken understanding of the facts." *Id. (citing Williams v. Stansbury,* 649 S.W. 2d 293, 296 (Tex. 1983); *Pioneer Oil Co. v. Vallejo,* 750 S.W. 2d 928, 930 (Tex. App.—Corpus Christi 1988, no writ)). "[A]n affirmative duty to speak or disclose arises only when a confidential or fiduciary relationship exists between the parties." *Casa El Sol-Acapul Co., S.A.,* 919 S.W. 2d at 718 (citations omitted). As previously discussed, no formal fiduciary duty existed between the Debtor and Griggs because "[a] director's fiduciary duty runs only to the corporation, not to the individual shareholders or even to a majority of the shareholders." *Hoggett,* 971 S.W.2d at 488. Also as previously discussed, no informal fiduciary existed between the Debtor and Griggs because there was no confidential relationship between the Debtor and Griggs. Given these conclusions, this Court sees no reason why it should not draw the same conclusions with respect to any relationship between the Debtor and Mrs. Griggs following Griggs' death. Indeed, there is no evidence that Mrs. Griggs, either before or after her husband's death, had any relationship with the Debtor. The absence of any fiduciary or confidential relationship between the Debtor and Mrs. Griggs means that the Debtor was under no duty, at the time he requested Mrs. Griggs to extend the maturity of the Note, to inform Mrs. Griggs that he intended to sue Griggs' estate. Accordingly, Mrs. Griggs fails to satisfy the first element of equitable estoppel.

### (ii)  Made with knowledge, actual or constructive, of those facts

Mrs. Griggs can satisfy the second element of estoppel if she can prove that the Debtor, on the day he asked her to extend the Note's maturity, had actual or constructive knowledge of any plan to sue Griggs' estate. *Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co.*, 341 F.3d 415, 422 (5th Cir. 2003).[4] While Mrs. Griggs introduced no evidence that the Debtor had actual knowledge that he planned to sue Griggs' probate estate on the day that he requested an extension of the Note's

---

[4]*See also Morgan v. Heiman-Marcus Group, Inc./Neiman-Marcus Direct*, 2005 U.S. Dist. LEXIS 34541, at *19) (unpublished opinion) (the court found that because an employee obtained facts of eligibility for benefits from her company and the records that showed those facts were readily available for discovery purposes, there was "sufficient knowledge of the facts" to satisfy the second element of equitable estoppel.)

maturity, there is sufficient evidence to show that the Debtor had constructive knowledge that he planned to take such action. When the Debtor made the request to extend the maturity of the Note, Griggs had been deceased for approximately two months, the Debtor had for many years understood Griggs' importance to the Company for generating new business, and the Debtor had always had access to the books and records of the Company (both before and after Griggs' death). [Finding of Fact No. 14, 35, 36, 37, 58.] In light of these facts, the Debtor must have known by this date that he would sue Griggs' estate or, at least might take such action. It strains credulity to conclude otherwise because according to the Debtor's own testimony, he knew in 2002 that Griggs had some form of cancer; that Griggs had undergone chemotherapy; that Griggs had told him that he just had a few spots on his liver; and that Griggs had represented to him just a few months before his death that he was in remission. Given all of this information, and given that Griggs died so soon after making these representations to the Debtor, this Court concludes that the Debtor, at the time he asked Mrs. Griggs to extend the Note's maturity, had constructive knowledge that he might sue Griggs' estate. Accordingly, Mrs. Griggs has satisfied the second element of estoppel.

### (iii)  With the intention that it should be acted on

Even if the Debtor knew all of the facts and circumstances needed to prove constructive knowledge of the fact that he planned to sue Griggs' estate for fraud, nondisclosure, and misrepresentation, equitable estoppel will still fail on the intent element. According to the Supreme Court of Texas, "[b]efore an estoppel can be raised, there must be certainty to every intent, and the facts alleged to constitute it are not to be taken by argument or inference." *Gulbenkian v. Penn*, 151 252 S.W.2d 929, 932 (Tex. 1952). The evidence must show a clear intent in order for equitable estoppel to be found. *Id.* "Nothing can be supplied by intendment." *Id.* In *Gulbenkian v. Penn*, the Supreme Court of Texas found that in order for the intent element of estoppel to be satisfied, the party asserting estoppel must show evidence of the other party's clear intent for the estoppel asserting party to act in a particular way. *Id.* Mrs. Griggs offered no evidence to establish that the Debtor, at the time that he requested an extension of the Note's maturity, definitely intended to sue

31

Griggs' estate and Mrs. Griggs for fraud, nondisclosure, and misrepresentation. Inference is not sufficient to support the intent element of equitable estoppel without clear evidence of the Debtor's intent. Accordingly, this Court concludes that Mrs. Griggs has failed to satisfy the third element.

### (iv)  **To a party without knowledge or means of obtaining knowledge of the facts**

The evidence shows that Mrs. Griggs did not know or have any way to find out about the Debtor's intent to sue Griggs' estate. Indeed, there was no reason for her to even suspect that the Debtor might bring suit. All that she knew was that her husband, upon his death, was the holder and owner of the Note; that because she was the sole beneficiary of her husband's estate, she effectively became the holder and owner of the Note; and that her husband's business colleague of many years was requesting her to extend the Note's maturity—a request that he made without ever complaining to her that he believed her late husband had made misrepresentations to him. Accordingly, under these circumstances, this Court finds that Mrs. Griggs has satisfied the fourth element.

### (v)  **Who detrimentally relies on the representations**

Finally, Mrs. Griggs, may prove the fifth element of estoppel because she detrimentally relied on the Debtor to pay the Note in full after he asked for an extension of the Note. In granting the extension, Mrs. Griggs clearly relied on the Debtor to fulfill his obligation and finish paying the balance of the Note. Mrs. Griggs relied to her detriment on the Debtor's promise to finish payments on the Note within the extension period because the Debtor stopped all payments and subsequently filed a counterclaim for fraud, nondisclosure, and misrepresentation. [Findings of Fact Nos. 39, 47.] Had Mrs. Griggs known that the Debtor was going to sue Griggs' estate, she would not have granted the extension and would have filed suit against him at the time. [Adversary No. 06-03158, Docket No. 12.] Therefore, Mrs. Griggs clearly relied to her detriment on the Debtor's promise to finish paying the Note. This Court finds that the fifth element is satisfied.

In sum, Mrs. Griggs has satisfied the second, fourth and fifth elements of equitable estoppel, but she has failed to meet the first and third. The Fifth Circuit, applying Texas law, has held "the failure to prove any one or more of the elements is fatal." *Med. Care Am., Inc.,* 341 F.3d at 422

(citing *Barfield v. Howard M. Smith Co.*, 426 S.W.2d 834, 838 (Tex. 1968)).  Accordingly, Mrs. Griggs cannot prevail using the affirmative defense of equitable estoppel.

### 4. Waiver

Mrs. Griggs argues that the Debtor waived his rights to recover from her.  [Adversary No. 06-03158, Docket No. 12.]  "Under Texas law, waiver is a voluntary, intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right."  *First Interstate Bank v. Interfund Corp.*, 924 F.2d 588, 595 (5th Cir. 1991); *see Edwin M. Jones Oil Co. v. Pend Oreille Oil & Gas Co.*, 794 S.W.2d 442, 447 (Tex. App.—Corpus Christi 1990, writ denied).  The elements of waiver are that a party: (1) possesses a right; (2) has knowledge, actual or constructive, of its existence; and (3) expressly relinquishes that right, or acts in a manner inconsistent with an intent to claim that right.  *See Interfund*, 924 F.2d at 595; *Palmer v. Fuqua*, 641 F.2d 1146, 1160 (5th Cir. 1981); *Roquemore v. Nat'l Commerce Bank*, 837 S.W.2d 212, 215 (Tex. App.—Texarkana 1992, no writ).  The Debtor's intentional conduct in asking Mrs. Griggs to extend the maturity of the Note is inconsistent with his counterclaim alleging fraud, nondisclosure, and misrepresentation.

#### (i) Possesses a right

The first element of waiver has been satisfied because the Debtor possessed the right to claim fraud at the time he asked Mrs. Griggs to extend maturity of the Note.

#### (ii) Knowledge of its existence

The Debtor had either actual or constructive knowledge of the existence of his right to sue for fraud, nondisclosure, and misrepresentation.  Actual knowledge is defined as "direct and clear knowledge," or "knowledge of such information as would lead a reasonable person to inquire further."  BLACK'S LAW DICTIONARY 876 (7th ed. 1999).  Constructive knowledge is defined as "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person."  *Id*.  While the Debtor may not have had direct and clear knowledge that he possessed the right, he arguably had enough knowledge that would lead a reasonable person to inquire further into whether or not he had the right to sue Griggs' estate for fraud, nondisclosure, and

misrepresentation. Alternatively, the Debtor had sufficient knowledge of the facts to constitute constructive knowledge of the existence of a right to sue.

The Court makes these conclusions for these reasons: by the time the Debtor asked Mrs. Griggs to extend the Note, the Debtor knew that Griggs had been diagnosed with cancer; had undergone chemotherapy; and had died a little over four months after the consummation of the stock sale. This knowledge, combined with the representations that the Debtor testified Griggs made to him about his cancer, would lead a reasonable person to know that he had a right to sue for fraud, or to at least investigate as to whether he had a right to sue for fraud.

A reasonable person purchasing stock for $750,000.00 would have done due diligence with respect to the stock sale and the state of Griggs' health. In failing to conduct his own due diligence, the Debtor is attributed, by law, the knowledge that one using reasonable care or diligence would have had. Thus, the Debtor had either actual or constructive knowledge. The Debtor's "carelessness or neglect may not avoid the waiver." *Highlands Ins. Co. v. Allstate Ins. Co.*, 688 F.2d 398, 405 (5th Cir. 1982). The second element of waiver is therefore satisfied.

### (iii) Expressly relinquishes that right, or acts in a manner inconsistent with an intent to claim that right

As a general rule, "intention is a prime factor in determining the question of waiver." *Weisbart & Co. v. First Nat'l Bank of Dalhart, Texas*, 568 F.2d 391, 396 (5th Cir. 1978) (quoting *Athens Commission Co. v. Lufkin Livestock Exchange, Inc.*, 439 S.W.2d 427, 430 (Tex. Civ. App.— Beaumont, 1969, writ ref'd n.r.e.)). In order to satisfy this element the party alleging waiver must show that the other party had an "unequivocal intention to no longer assert the right." *Id.* Further, generally speaking "[w]aiver by implication will be applied only to prevent fraud or inequitable consequences." *Id.* Under the Texas Business and Commerce Code, rights involving a security interest can be waived once the party manifests an express intent to waive their rights. *First Interstate Bank of Arizona v. Interfund Corporation*, 924 F.2d 588, 595 (5th Cir. 1991) (citing Tex. Bus. & Com. Code § 9.306(b)).

34

Mrs. Griggs argues that the Debtor relinquished his right to sue for fraud when he asked for an extension on the maturity of the Note. [Adversary No. 06-03158, Docket No. 12.] In asking for an extension of the maturity of the Note, the Debtor wanted to avoid breach of the Note. In requesting the extension, the Debtor indicated to Mrs. Griggs a desire to pay the Note in full. This desire to pay the note in full can be considered inconsistent with the Debtor's current claims of fraud, nondisclosure, and misrepresentation; however, the attempt to satisfy a debt is not an "unequivocal intention" nor an express interest to waive a future right to bring legal challenges to a debt. *Weisbart*, 568 F.2d at 396. Further, the facts of this case are not sufficiently egregious to allow a "waiver by implication". The courts should encourage parties to attempt to pay their obligations first, without risk of waiving possible future legal rights and defenses.

In sum, Mrs. Griggs has satisfied the first and second elements of waiver, but not the third. Accordingly, Mrs. Griggs cannot prevail using the affirmative defense of waiver.

### F.  Webber is liable for the remaining amounts owed under the Note.

Because this Court has concluded that the Debtor is not entitled to any of the relief which he has sought—including the cancellation of the Stock Purchase Agreement and the Note—this Court necessarily concludes that the Note is enforceable. Therefore, the Debtor remains liable for the amounts due under the Note. As of the date of the trial in this Adversary Proceeding, the total amount of unpaid principal was $180,930.00, and the total amount of accrued unpaid interest was $43,423.20. [Finding of Fact No. 39.] Accordingly, the amount of principal and interest for which the Debtor is liable is $224,353.20.[5] Additionally, the Debtor is liable under the Note for attorney's fees. The amount for which he is liable was disputed at trial and is discussed below.

### G.  Mrs. Griggs is entitled to recover attorney's fees from the Debtor.

The Debtor argues that Mrs. Griggs is limited in recovering attorney's fees for any one of the following reasons: (a) Mrs. Griggs' attorney, Boyd, did not segregate fees for the claim and the

---

[5]This claim held by Mrs. Griggs is a secured claim that is over-secured, as subsequently discussed herein.

counterclaim; (b) the oral contingency fee agreement between Boyd and Mrs. Griggs is invalid according to Texas State Bar rules; or (c) the Note has a 10% limiting provision that acts as a ceiling to recovery of Boyd's fees. Mrs. Griggs responds that: (1) Texas law does not require attorneys to segregate fees; (2) the oral fee agreement is valid; and (3) the 10% provision is not a cap.

### 1. Boyd does not have a duty to segregate attorney's fees.

This Court finds that Boyd does not have a duty to segregate attorney's fees. The Texas Supreme Court recognizes that an exception to the duty to segregate attorney's fees arises when the attorney's fees rendered are "in connection with claims arising out of the same transaction and are so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.'" *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991) (quoting *Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d 622, 624-25 (Tex. App.—Dallas 1987, writ denied)). Specifically, "[when] the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Sterling*, 822 S.W.2d at 11 (quoting *Gill Sav. Ass'n v. Chair King, Inc.*, 783 S.W.2d 674, 680 (Tex. App.—Houston [14th Dist.] 1989, writ granted), *aff'd & modified*, 797 S.W.2d 31 (Tex. 1990)). Application of the so-called "inextricably intertwined" standard from *Sterling* "requires determinations as to whether the claims in question arise out of the same transaction and whether they depend on proof or denial of essentially the same facts. These determinations, in turn, involve an analysis of both the claims asserted and the facts upon which these claims are based." *Air Routing Int'l Corp. v. Britannia Airways, Ltd.*, 150 S.W.3d 682, 687 (Tex. App.—Houston [14th Dist.] 2004) (citing *Sterling*, 822 S.W.2d at 11-12).

Mrs. Griggs' original claim was filed to enforce the terms of the Note and the Stock Purchase Agreement regarding the sale of the Company to the Debtor. The Debtor's counterclaim alleged fraud, nondisclosure, and misrepresentation in purchasing the Company from Griggs. Both Mrs. Griggs' claim and the Debtor's counterclaim arise out of the sale and purchase of the Company from

Griggs to the Debtor. Boyd testified that prosecuting the claim and defending against the counterclaim are so intertwined that it is very difficult to separate out the work. [Finding of Fact No. 69.] Because the prosecution of the claim and the defense of the counterclaim both arise from the same transaction and are so intertwined that their "prosecution or defense entails proof or denial of essentially the same facts," this Court concludes that Boyd meets the exception to the duty to segregate attorney's fees. *Sterling*, 822 S.W.2d at 11 (quoting *Flint*, 739 S.W.2d at 625). Accordingly, the Debtor is liable to Mrs. Griggs of the attorney's fees that she has incurred.

### 2. Boyd can recover on an oral contingency fee agreement on two alternative grounds.

This Court finds that contrary to the Debtor's contention, Boyd can recover fees on his oral contingency fee agreement.

#### (i) Boyd may recover attorney's fees despite Texas Government Code § 82.065.

Texas Government Code § 82.065(a) further states, "[a] contingent fee contract for legal services must be in writing and signed by the attorney and client." TEX. GOV'T CODE ANN. § 82.065(a) (Vernon 2005).

Texas Government Code § 82.065(b) further states, "[a] contingent fee contract for legal services is voidable *by the client*" if it does not conform to the laws of the state or the Disciplinary Rules of the state bar. TEX. GOV'T CODE ANN. § 82.065(b) (Vernon 2005) (emphasis added). Texas Government Code § 82.065(b) seems to state that an oral contingency fee agreement is voidable if a person with standing challenges the contract. Otherwise, if no challenge is made, the agreement is legal and enforceable. TEX. GOV'T CODE ANN. § 82.065(b) (Vernon 2005).[6] The only person who has standing to challenge the oral agreement is the client. Boyd testified, and this Court found, that Boyd has no formal written agreement with Mrs. Griggs, but rather has only an oral

---

[6] *E.g. Lykos v. Welling*, No. 3-94-CV-2019-R, 1997 U.S. Dist. LEXIS 4775, at *8 (N.D. Tex. Feb. 13, 1997) (opinion not designated for publication) (court holds that the Disciplinary Rules of the State Bar do not render such an agreement illegal but rather voidable.). *See also Martel v. Martel*, No. 05-99-00177-CV, 2001 Tex. App. LEXIS 6025, at *20 (Tex. App.—Dallas 2001, no pet.) (opinion not designated for publication) (court of appeals holds that a husband did not have standing to void his wife's oral contingency agreement with her divorce attorney.).

agreement. [Finding of Fact No. 68.] While the client—here, Mrs. Griggs— may challenge the contract, neither the Debtor nor his counsel have standing to void Boyd's oral contingency agreement. Because Mrs. Griggs has not challenged this oral contract, it is legal and enforceable. Accordingly, Boyd is entitled to recover his attorney's fees.

### (ii) Alternatively, Boyd may recover on principles of *quantum meruit*.

Under Texas law, to recover under *quantum meruit,* the claimant must prove that: "(1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; [and] (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged." *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 606 (5th Cir. 2000). Moreover, "[r]ecovery in *quantum meruit* will be had when non payment for the services rendered would 'result in an unjust enrichment to the party benefitted by the work.'" *Id.* (quoting *City of Ingleside v. Stewart*, 554 S.W.2d 939, 943 (5th Cir. 2000)).

The Fifth Circuit has further held that even an attorney dismissed from a diversity case that had no written contingent fee contract was allowed to recover reasonable attorney's fees on a *quantum meruit* basis. *Calm C's v. Shamburger (In re Calm C's)*, No. 05-30319, 2006 U.S. App. LEXIS 11687 (5th Cir. May 11, 2006) (opinion not designated for publication).

The state of Mississippi has a statute similar to Texas Government Code § 82.065(a) requiring that contingency fee agreements be written. Miss. R. of Prof. Conduct 1.5(c). The Supreme Court of Mississippi has nevertheless allowed an attorney attempting to claim a fee under an oral contingency fee agreement to recover attorney's fees. *Lowrey v. In re Will of Smith*, 543 So.2d 1155, 1163 (Miss. 1989). In *Lowrey v. In re Will of Smith*, the Supreme Court of Mississippi articulated that the attorney has the burden of proving he fully disclosed all terms of the agreement, that it was fair and reasonable, and that it was made in good faith. *Id.*

34

States in other circuits have similarly applied the principle of *quantum meruit* in the recovery of attorney's fees. The New Jersey Supreme Court has held that an oral contingency fee agreement was invalid because it was not reduced to writing; however, the court allowed the attorney to recover attorney's fees based on *quantum meruit*. *Starkey, Kelly, Blaney, & White v. Estate of Nicolaysen*, 172 N.J. 60, 67-69 (2002). The court stated that the purpose of the rule reducing such agreements to writing is to avoid fraud and misunderstanding. *Id.*

Applying the elements of *quantum meruit* to the legal services Boyd provided to Mrs. Griggs shows that: (1) Boyd provided valuable legal services; (2) Boyd provided his services to Mrs. Griggs, the person sought to be charged; (3) Mrs. Griggs accepted Boyd's legal services and used them in pursuing the claim and defending against the counterclaim; and (4) Boyd was expecting, and in fact contracted with Mrs. Griggs, to be paid for the legal services he performed in pursuing her original claim and defending her against the Debtor's counterclaims. Boyd testified that he spent in excess of 400 hours prosecuting Mrs. Griggs' original claim and defending against the counterclaims. [Finding of Fact No. 69.] Voiding Boyd's oral contingency fee agreement would be unjust to Boyd. This Court finds that even if the oral contingency fee agreement is void, Boyd may recover attorney's fees on the equitable principle of *quantum meruit*.

### 3. Mrs. Griggs may fully recover her attorney's fees despite the "limiting provision" in the Note.

The Note contains language suggesting that there is a cap on the amount of attorney's fees that the holder of the Note may recover. Specifically, the Note contains the following language: "The undersigned hereby agrees to pay all expenses incurred, <u>including an additional 10% on the amount of principal and interest hereof as attorney's fees,</u> all of which shall become a part of the principal hereof, if this note is placed in the hands of an attorney for collection, or if collected by suit or through any probate, bankruptcy or any other legal proceedings." (emphasis added) (Griggs' Exhibit No. 5.) This Court holds that this language does not act as a ceiling to Mrs. Griggs' recovery of attorney's fees.

35

The Fifth Circuit has explicitly stated that "[s]tate law controls both the award of and the reasonableness of [attorney's] fees awarded where state law supplies the rule of decision." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). The opinion continues, "[u]nder Texas law, when a prevailing party in a breach of contract suit seeks fees, an award of reasonable fees is mandatory, as long as there is proof of reasonable fees." *Mathis*, 302 F.3d at 462 (citing Texas Civ. Prac. and Rem. Code § 38.001). The holding in *Mathis* was reaffirmed by the Fifth Circuit in 2003 in another breach of contract case, where the court restated and applied the holding in *Mathis*. *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 433 (5th Cir. 2003)

Because the Fifth Circuit has held that "state law controls both the award and reasonableness of fees awarded," this Court must turn to Texas law. *Mathis*, 302 F.3d at 461. The Texas Civil Practice and Remedies Code § 38.001 regarding "Recovery of Attorney's Fees" states that, "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: (1) rendered services; (2) performed labor . . . (8) an oral or written contract." TEX. CIV. PRAC. & REM. CODE § 38.001 (Vernon 2005). There is no question that Boyd rendered services and performed labor pursuant to an oral contract with Mrs. Griggs. The question is whether the language in the Note limits Boyd's fees.

The Texas Supreme Court has held that "Texas courts do not regard agreements to pay attorney's fees based on a percentage of the unpaid balance and interest on a promissory note as absolute promises to pay the contractual amount, but as contracts to indemnify the holder of the note for attorney's expenses actually incurred in collecting the principal and interest on the note." *F.R. Hernandez Constr. & Supply Co. v. Nat'l Bank of Commerce*, 578 S.W.2d 675, 676 (Tex. 1979). Moreover, the Eastland Court of Appeals appears to recognize that "a holder of a note can seek to recover 'reasonable' attorney's fees in excess of the contractual note percentage." *Estate of Montague v. Nat'l Loan Investors*, 70 S.W.3d 242, 250 (Tex. App.—San Antonio 2001, pet. denied) (interpreting *Farm Credit Bank of Texas v. Snyder Nat'l Bank*, 802 S.W.2d 709, 715-16 (Tex. App.—Eastland 1990, writ denied)). Finally, the court in *Montague* has explicitly held that "if the

36

obligor can challenge the reasonableness of the attorney's fees despite the contractual provision, the holder is also able to prove that a reasonable attorney's fee exceeds the contractual percentage in view of the Texas Supreme Court's holding that the provision is regarded as an agreement to indemnify the holder for expenses actually incurred." *Montague*, 70 S.W.3d at 251-52.

However, two other Texas appellate courts take contrary views to limiting provisions. In *Coastal Shutters & Insulation, Inc. v. Derr*, 809 S.W.2d 916, 922-23 (Tex. App.—Houston [14th Dist.] 1991, no writ), the trial court held that the contractual note provision limited recovery of attorney's fees to 10% because the note was the basis of the lawsuit. Justice Murphy dissented from the holding, citing the Texas Supreme Court's decision in *Hernandez*, 578 S.W.2d at 676, that a note is a contract to indemnify the holder of the note for expenses actually incurred. *Coastal Shutters*, 809 S.W.2d at 923. Additionally, in *Matherne v. Carre*, 7 S.W.3d 903, 908 (Tex. App.—Beaumont 1999, pet. denied), the court similarly limited recovery of attorney's fees to the 10% stipulated in the note.

These two opinions track with a 1991 Fifth Circuit opinion. Without citing any case law, the Fifth Circuit stated that limiting provisions in promissory notes regarding attorney's fees actually limit the amount of fees that may be recovered. *1488, Inc. v. Philsec Inv. Corp.*, 939 F.2d 1281, 1292 (5th Cir. 1991). Moreover, the Fifth Circuit went on to state that later stipulations between parties agreeing to a greater amount of reasonable attorney's fees does not override the promissory note's limiting provision. *Id.*

Despite these opinions, this Court finds that Boyd may recover attorney's fees in an amount exceeding 10% of the outstanding amount of principal and interest under the Note. The Court arrives at this conclusion because: (1) subsequent opinions from the Fifth Circuit—such as *Mathis* and *DP Solutions, Inc.*—have held that state law controls the amount of the award; (2) the most recent Texas case on point—*Estate of Montague*—has held that such language does not cap the amount of an award of attorney's fees; and (3) this Court believes that the holding in *Estate of*

*Montague* is correct given this Court's interpretation of the Texas Supreme Court's holding in *Hernandez Constr. & Supply Co.*

Boyd testified that he would reasonably bill $60,000.00 for his time working on this case, billing usually between $150.00 and $200.00 an hour. [Findings of Fact Nos. 69, 71.] Moreover, the Debtor's attorney, Strother, testified that the value of his time for prosecuting the counterclaims and defending against Mrs. Griggs' claim totaled $53,000.00, which lends support to the reasonableness of Boyd's attorney's fees. [Finding of Fact No. 69.]

Therefore, this Court finds that: (1) Boyd did not have a duty to segregate attorney's fees; (2) the oral contingency agreement is valid; and (3) the 10% limiting provision does not act as a ceiling to Mrs. Griggs' recovery of attorney's fees from the Debtor. Accordingly, the amount of attorney's fees owed by the Debtor under the Note is $60,000.00, and not 10% of the outstanding principal and accrued unpaid interest.[7]

### H. The Debtor's Objection to Mrs. Griggs' Proof of Claim is overruled in all respects

In addition to asserting various claims against Mrs. Griggs and her late husband, the Debtor also lodged an objection to the Proof of Claim that Mrs. Griggs filed. The objection is based upon several grounds, including the argument that Mrs. Griggs and her late husband deceived the Debtor into signing the Stock Purchase Agreement and the Note. As already discussed in this Memorandum Opinion, the Court has already ruled against the Debtor on these issues. The Court now needs to address the remaining grounds that the Debtor has articulated in his objection to Mrs. Griggs' Proof of Claim. These grounds are as follows: (1) There is no security agreement in existence, and therefore any claim held by Mrs. Griggs is a completely unsecured claim; (2) Neither Griggs nor his wife have a security interest in the stock that Griggs sold to the Debtor because they have failed to comply with Articles 8 and 9 of the Texas Business and Commerce Code, including

---

[7]As noted previously, the outstanding amount of principal and accrued interest under the Note is $224,353.20.  10% of this figure is $22,435.32.  Accordingly, if this Court is incorrect in its conclusion that the language in the Note does not limit recovery of Boyd's fees totaling $60,000.00, then this Court finds that Mrs. Griggs is entitled to recover from the Debtor attorney's fees totaling $22,435.32.

a failure to possess the stock; and (3) Even if Mrs. Griggs has a security interest in the stock, this interest is unperfected because no UCC-1 financing statement has ever been filed with the Secretary of the State of Texas.

### 1. Griggs acquired a security interest in the Debtor's stock, and this security interest is properly perfected.

"A security interest is perfected when it has attached and when all the applicable steps required for perfection have been taken." *Fin. Servs., Inc. v. Republic Nat'l Bank*, No. 01-03-01356-CV, 2005 Tex. App. LEXIS 345, at *15 (Tex. App.—Houston [1st Dist.] Jan. 13, 2005, no pet.) (citing TEX. BUS. & COM. CODE ANN. § 9.308(a) (Vernon 2002) (incorporating U.C.C. § 9-308(a))[8]).

### (i) Griggs has a valid security interest in the Debtor's stock.

Generally, a security interest attaches to collateral when (1) the debtor authenticates a security agreement that provides a description of the collateral; (2) the secured party gives the debtor value for the security interest; and (3) the debtor has rights in the collateral. TEX. BUS. & COM. CODE ANN. § 9.203(b) (Vernon 2002 & Supp. 2005).

### (a) The Debtor authenticated a security agreement.

Although the Debtor did not execute a document entitled "Security Agreement," the Debtor did execute and sign the Stock Purchase Agreement and the Note conveying a security interest in the stock. "A security agreement need not be evidenced by a single document; two or more writings, considered together, may constitute a security agreement." *Looney v. Nuss (In re Miller)*, 545 F.2d 916, 919 n.4 (5th Cir. 1977) (citing *In re Numeric Corp.*, 485 F.2d 1328, 1331 (1st Cir. 1973). Therefore, taken together, the Stock Purchase Agreement and the Promissory Note could constitute a valid security agreement.

Whether these two documents are sufficient to create a security interest depends on the parties' intent. *See Superior Packing, Inc. v. Worldwide Leasing & Fin., Inc.*, 880 S.W.2d 67, 71 (Tex. App.—Houston [14th Dist.] 1994, writ denied) ("Generally, the test for creation of a security

---

[8] Hereinafter, each section of the Texas Business and Commerce Code that is cited will also be incorporating the Uniform Commercial Code but it will not so expressly state.

interest is whether the transaction was *intended* to have the effect as security ...."); *see also In re Miller*, 545 F.2d at 918 ("The principal test for determining whether a transaction is to be treated as a security interest is: '[I]s the transaction intended to have effect as security?'") (citing TEX. BUS. & COM. CODE ANN. § 9.102 cmt. 1).   In the present case, the Note and the Stock Purchase Agreement clearly evidence the parties' intent to create a security interest for Griggs in the Debtor's stock. The Note specifies that "payment of this note is secured by the stock of . . . Griggs." [Griggs' Exhibit No. 5.] In addition, the Stock Purchase Agreement provides: "[a]s security for payment of the note, Griggs' stock will be endorsed for transfer but held by the attorney for the Company, Ben B. Turner, Jr. until final payment is made." [Griggs' Exhibit No. 4.]  The Note and the Stock Purchase Agreement therefore make clear that the parties intended for Griggs to have a security interest in the Debtor's stock.  Moreover, the Debtor signed the Note and the Stock Purchase Agreement, which includes a description of the collateral as required by Texas Business and Commerce Code § 9.203(b)(3)(A).  Therefore, the Debtor authenticated a valid security agreement.

### (b)  Griggs gave the Debtor value for the security interest.

As evidenced by the Stock Purchase Agreement, Griggs gave the Debtor 500 shares of stock in the Company in exchange for a payment of $50,000.00 and a promissory note for $700,000.00. (Griggs' Exhibit No. 4.)  Griggs therefore gave value for the security interest in the Debtor's stock..

### (c)  The Debtor has rights in the collateral.

The collateral in the present case is the stock purchased by the Debtor in accordance with the Stock Purchase Agreement.  After executing the Stock Purchase Agreement, Griggs endorsed the stock for transfer; the attorney for the Company, Ben B. Turner, Jr., has held the stock—and will continue to hold the stock—until the final payment on the Note is made.  Although the Debtor was not recorded as the registered owner of the stock, the Stock Purchase Agreement does evidence that the Debtor "purchas[ed] all of Griggs' stock" for a "total consideration of $750,000.00," $700,000.00 of which is evidenced by the Note. [Griggs' Exhibit No. 4.]  Even though the Debtor was not the registered owner of the stock, the evidence supports the conclusion that the Debtor has some rights

in the stock. "A debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach." TEX. BUS. & COM. CODE ANN. § 9.203 cmt. 6 (Vernon 2005 & Supp. 2006).

There is additional evidence tending to show that the Debtor has an interest in the stock. The Stock Purchase Agreement provides that "Griggs may continue as an Officer and Director of the Company, upon mutual agreement." [Griggs' Exhibit No. 4.] If the Debtor did not have an interest in the stock, then Griggs would not have needed a mutual agreement between the Debtor and himself in order to continue as an officer and director of the Company. Therefore, the mutual agreement contemplated in the Stock Purchase Agreement tends to indicate that the Debtor has rights in the stock originally owned by Griggs.

Two additional documents indicate that the Debtor has an interest in the stock. One is the document that reflects the Debtor as being the "sole Guarantor" of the Company's revolving line of credit. [Griggs' Exhibit No. 6.] Declaring oneself as the sole guarantor of the Company's entire line of credit tends to indicate that one has ownership rights to all of the Company's stock. Had the Debtor not obtained an interest in the stock, he would probably not have declared himself the sole guarantor. The other document indicating that the Debtor had rights in the stock is the Debtor's balance sheet. On the Debtor's balance sheet dated March 22, 2002, the Debtor listed as an asset $566,000.00 worth of the Company's stock. [Griggs' Exhibit No. 13.] However, on the Debtor's balance sheet dated March 31, 2003, the Debtor listed as an asset $1,500,000.00 of the Company's stock. *Id*. Moreover, on the Debtor's balance sheets dated August 31, 2003 and May 24, 2004, the Debtor listed as an asset $4,200,000.00 and $3,000,000.00 of the Company's stock, respectively. *Id*. This change in value of the stock owned by the Debtor reflects the Debtor's recognition that he acquired an ownership interest in Griggs' stock. In addition, the Debtor's April 30, 2005 balance sheet even specifies that the Debtor owns "100% Stock in Southwest." *Id*. Therefore, the evidence indicates that the Debtor himself believes, and has believed continuously since the execution of the Stock Purchase Agreement, that he has an interest in the stock.

41

Because the Stock Purchase Agreement evidences the Debtor's purchase of the stock, and because the Debtor's actions are consistent with having an interest in the stock, this Court concludes that the Debtor had sufficient rights in the stock for a security interest to attach.

### (ii)  Griggs has a perfected security interest in the Debtor's stock.

As a threshold matter, the Debtor's stock is a certificated security as defined in Texas Business and Commerce Code § 8.102(a)(4).  A security is "an obligation of an issuer or a share . . . (A) that is represented by a security in bearer or registered form, . . . (B) that is one of a class or series . . . [and] (C)(i) . . . is of a type, dealt or traded on . . . securities markets; . . . or is a medium for investment . . . ." TEX. BUS. & COM. CODE ANN. § 8.102(a)(15) (Vernon 2005).  The certificate of stock in the present case is in bearer form because it contains language that is "payable to the bearer of the security certificate according to its terms . . . ." TEX. BUS. & COM. CODE ANN. § 8.102(a)(2) (Vernon 2005).  The stock is also "one of a class or series" because the stock is registered as being in the class of common stock. [Griggs' Exhibit No. 17.]  Finally, even though the stock is of a closely-held corporation, the stock here also meets the third requirement that it be traded on a securities market or be a medium for investment. *See Kenney v. Porter*, 604 S.W.2d 297, 301 (Tex. Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.) ("It is clear that the intent of the draftsmen was to liberally construe the definition of security in § 8.102 so as to include closely-held corporate stock.").  Therefore, because the stock in the present case is represented by a certificate and the stock is a "security" as defined by Texas Business and Commerce Code § 8.102(a)(15), the Debtor's stock is a certificated security.

"A secured party may perfect a security interest in certificated securities by taking delivery of the certificated securities under Section 8.301." TEX. BUS. & COM. CODE ANN. § 9.313(a) (Vernon 2005).  Section 8.301 provides that "[d]elivery of a certificated security to a purchaser occurs when . . . another person . . . either acquires possession of the security certificate on behalf of the purchaser or, having previously acquired possession of the certificate, acknowledges that it holds for the purchaser . . . ." TEX. BUS. & COM. CODE ANN. § 8.301(a)(2) (Vernon 2005).

42

In the present case, the certificated securities were delivered to Griggs, the "purchaser" of the security interest, when Turner, the Company's attorney, "acquired possession of the certificate." TEX. BUS. & COM. CODE ANN. § 1.201(29), (30) (Vernon 2005) (The definition of "purchase" includes "taking by . . . security interest . . . .")[9]; TEX. BUS. & COM. CODE ANN. § 8.301(a)(2) (Vernon 2005). The Stock Purchase Agreement makes clear that Turner holds the stock "[a]s security for the payment of the note." [Griggs' Exhibit No. 4.] Turner therefore holds the stock "on behalf of [Griggs,] the purchaser." TEX. BUS. & COM. CODE ANN. § 8.301(a)(2) (Vernon 2005). Indeed, Turner himself also has acknowledged that he has been "holding the stock certificate that was issued to Dr. Griggs . . . pursuant to the terms of the Stock Purchase Agreement." [Griggs' Exhibit No. 18.] Turner stated that he would "deliver [the] certificate to [the Debtor] when [the Debtor] . . . completed the terms of the Stock Purchase Agreement." *Id.*

The certificated security was properly delivered to Griggs, the purchaser, within the meaning of § 8.301 of the Uniform Commercial Code because Turner acquired possession of the security certificate on behalf of Griggs. *Id.* Therefore Griggs, as a secured party, properly perfected his security interest in the certificated securities. *See* TEX. BUS. & COM. CODE ANN. § 9.313(a) (Vernon 2005).

---

[9] The Uniform Commercial Code's use of the word "purchaser" in the context of § 8-301 and § 9-313(a) is unfortunately not very clear. Section 9-313(a) provides that a "secured party may perfect ... by taking delivery ... under Section 8-301." § 9-313(a) (2006). Section 8-301, however, discusses how and when a "purchaser" takes delivery. In order to resolve the apparent disconnect between the terms "secured party" and "purchaser," one must take note that a secured party is also a "purchaser" because to "'purchase' means taking by ... security interest." § 1-201(29); *see also Hale v. Kontaratos (In re Kontaratos)*, 10 B.R. 956, 962 n.27 (Bankr. D. Me. 1981) ("DTC purchased a security interest in the stock ...."). Therefore, under the Uniform Commercial Code, a secured party is considered a purchaser by virtue of purchasing a security interest. Bearing this in mind, however, one must also beware not to confuse the purchaser of the stock with the purchaser of the security interest.

**2. Mrs. Griggs, as the sole beneficiary of her late husband's probate estate, now holds a properly perfected security interest in the stock sold by her late husband to the Debtor. By having timely filed a Proof of Claim in the Debtor's case, she holds a secured claim against the Debtor and his bankruptcy estate which must be treated under the Debtor's plan of reorganization.**

The filing of a proof of claim is the means through which a creditor elects to be paid as a personal liability of the debtor—i.e. from the estate's funds under a plan. *In re Macias*, 195 B.R. 659 (Bankr. W.D. Tex. 1996). Mrs. Griggs timely filed a proof of claim on March 1, 2006 setting forth that she has a secured claim for $180,930.00. [Finding of Fact No. 49.] Because this Court has held that Mrs. Griggs has a properly perfected security interest on the stock sold by Griggs to the Debtor, her assertion in the proof of claim that she holds a secured claim is correct. Accordingly, the Debtor's contention in his Objection that, at best, Mrs. Griggs holds nothing more than an unsecured claim is incorrect.

Whether all of Mrs. Griggs' claim is secured or whether only a portion of the claim is secured, with the remaining portion being unsecured, depends upon the value of the collateral. Here, the collateral is the stock that Griggs sold to the Debtor on December 6, 2002. [Finding of Fact No. 28.] In his Schedule B, the Debtor sets forth that he owns 500 shares of the Company's stock, and that the book value of this stock is $259,398.00 [Main Case, Docket No. 10.]. It is unclear to this Court why the Debtor only scheduled 500 shares when he actually owns 1000 shares, but the Court suspects that the Debtor scheduled only 500 shares in order to preserve his right to argue in this Adversary Proceeding that because the Stock Purchase Agreement is invalid, he never purchased the 500 shares owned by Griggs. Because this Court has upheld the validity of the Stock Purchase Agreement, it necessarily follows that the Debtor owns not just 500 shares, but all 1000 shares, representing the 500 shares that the Debtor initially purchased many years ago (which shares are unencumbered) plus the 500 shares that the Debtor purchased from Griggs on December 6, 2002 (which shares are encumbered). Certainly one way of valuing the 500 encumbered shares is to use the book value of $259,398.00 that the Debtor used in valuing his unencumbered shares on Schedule B. However, the Court rejects this approach because the value is supposed to be the fair market

44

value, not the book value. 5 COLLIER ON BANKRUPTCY ¶ 506.03[6] (15th ed. 2006). The value must be some other figure.

The Debtor paid $750,000.00 to Griggs for the 500 shares in December of 2002. Thereafter, on August 31, 2003, the Debtor represented to Sterling Bank that the entire 1000 shares were worth $4.2 million. [Finding of Fact No. 38.]   Subsequently, on May 31, 2004, the Debtor represented to Sterling Bank that the entire 1000 shares were worth $3.0 million. Finally, on April 30, 2005, the Debtor represented to Sterling Bank that the entire 1000 shares were still worth $3.0 million. Based upon the Debtor's own numbers, the value of the encumbered 500 shares was worth $2.1 million on August 31, 2003, $1.5 million on May 31, 2004, and $1.5 million on April 30, 2005. The Court has heard no evidence about whether the value of the shares has increased or decreased since April 30, 2005. However, at trial, the Debtor testified that he believed the Company's business was on the upswing. Accordingly, it is fair for this Court to infer that the value has not declined based on the Debtor's testimony that the Company's business is on the upswing. Accordingly, this Court finds that the value of the 500 encumbered shares is at least $1.5 million.

Because the value of the collateral is more than $1 million  in excess of the amount owed by the Debtor to Mrs. Griggs under the Note, Mrs. Griggs holds a fully secured claim in this Chapter 11 case; she therefore  holds no unsecured claim[10].

## IV. CREDIBILITY OF WITNESSES

This Court heard testimony from the following witnesses: (1) the Debtor; (2) Mr. Boyd; (3) Mr. Schumacher; (4); Mrs. Griggs; and (5) Mr. Strother.[11]   The Court finds that all witnesses were

_____

[10]Although Mrs. Griggs' initial Proof of Claim, filed on March 1, 2006, set forth that she holds a secured claim for $180,930.00, on July 7, 2006, she filed a motion to amend her proof of claim [Case No. 06-30434, Docket No. 62]. This motion seeks leave of Court to amend the proof of claim so that accrued unpaid interest, plus attorney's fees, can be added to the claim. The Court has granted this motion in a separate order docketed simultaneously with the docketing of this Memorandum Opinion and the Judgment relating to this Opinion. With this Court's granting of Mrs. Griggs' motion to amend, the amount of her secured claim for this Chapter 11 case is $284,353.20, representing the sum of $180,930.00 (i.e. unpaid principal), $43,423.20 (i.e. accrued unpaid interest), plus $60,000.00 (i.e. reasonable attorney's fees).

[11]Additionally, counsel for the Debtor read into the record portions of the transcript of the deposition of Dr. Melanie Thomas.

45

credible except as follows: First, the Debtor was simply not convincing that he was defrauded. At trial, he hardly became animated when he discussed the alleged misrepresentations. Moreover, he stated that Griggs and he trusted each other and that Griggs' integrity had never been impugned. Indeed, after Griggs' death, the Debtor never once mentioned to Mrs. Griggs that her late husband had deceived him. It strains credulity to believe that the Debtor felt deceived by Griggs when the Debtor was totally silent on this point when communicating with Mrs. Griggs, particularly when making a request to extend the maturity date of the Note. One would think that if the Debtor really believed Griggs had defrauded him, the Debtor, when requesting an extension of the Note's maturity date, would have suggested to Mrs. Griggs that, at a minimum, she owed it to him to grant the extension given the fraud committed by her late husband. The Debtor's silence speaks volumes to this Court: the Debtor really does not believe that Griggs defrauded him. The fact that the Company's marketing materials today make positive references to Griggs' history with the Company underscores this conclusion.

Second, this Court is skeptical about the conclusions arrived at by Mr. Schumacher, the expert witness called by the Debtor to testify about the value of the Company's stock as of December 31, 2002 (i.e. shortly after the Debtor purchased Griggs' share of the Company such that the Debtor became the 100% owner of the Company). This Court gives little weight to Schumacher's valuation testimony because (1) On cross examination, Boyd adduced testimony from Schumacher that his analysis was essentially contaminated through comments which the Debtor made to Schumacher when he retained him to appraise the stock; (2) Schumacher's first appraisal, which was completed on October 11, 2004, stated that the value of 100% of the Company's stock was $900,000.00, but at some point thereafter—the evidence is not clear exactly when—Schumacher revised this figure downward to a range of $300,000.00 to $500,000.00. Aside from the fact that Schumacher's first appraisal was difficult to do simply because the appraisal was for a date (i.e. December 31, 2002) almost two years after the fact, the second appraisal is even more speculative. Indeed, Schumacher's one and a half page undated letter [Debtor's Exhibit No. 25] fails to adequately explain how this

46

range of $300,000.00 to $500,000.00 was determined; (3) Schumacher's testimony at trial was simply not very compelling; and (4) The Debtor himself, who has always had complete access to the books and records of the Company, submitted a financial statement to Sterling Bank just a few months after Griggs' death setting forth that the value of his shares of stock as of August 31, 2003—which was 100% of the outstanding shares—was $4.2 million. [Finding of Fact No. 38.]

In testing how much weight to give to Schumacher's testimony and appraisal concerning the value of the Company as of December 31, 2002, this Court must focus on the fact that the owner of the Company himself represented to a financial institution at a point and time much closer to December 31, 2002 that the value of the Company was $4.2 million. It strains credulity to believe that Schumacher's value of $300,000.00 to $500,000.00 as of December 31, 2002 is within hailing distance of reasonableness when the Debtor himself has made a representation to the Company's lender that the value of the Company as of August 31, 2003 is $4.2 million. It further strains credulity to believe that Schumacher's value is accurate when the Debtor himself, six months after receiving Schumacher's appraisal (dated October 11, 2004), represented to Sterling Bank (on April 30, 2005) that the value of all of the Company was $3.0 million. If, as Schumacher testified, the value of the Company on December 31, 2002—a date when Griggs was still alive—was either $300,000.00 to $500,000.00, or $900,000.00, then how could it be that on April 30, 2005—more than two years after Griggs' death and therefore more than two years without the Company's main business developer—the value of the Company had risen to $3.0 million? Either Schumacher's appraisal is must too low, or the Debtor's representation to Sterling Bank is much too high. This Court believes, and so finds, that the Debtor knows much more about the Company than Schumacher, which leads this Court to believe, and so find, that Schumacher's testimony is deserving of little weight. For all of these reasons, the Court gives very little weight to Schumacher's testimony and appraisals.

47

## V.  CONCLUSION

For the reasons set forth above, a Judgment in the Adversary Proceeding will be entered on the docket that denies all relief requested by the Debtor in his counterclaim against Mrs. Griggs and grants the following relief to Mrs. Griggs:

1.      That the Debtor is liable to Mrs. Griggs pursuant to the terms of the Note;

2.      That the amount of unpaid principal owed under the Note is $180,930.00;

3.      That the amount of accrued, unpaid interest owed under the Note is $43,423.20;

4.      That the amount of attorney's fees incurred by Joan Griggs is $60,000.00, and that all of these fees are owed under the Note;

5.      That the total amount owed by the Debtor to Mrs. Griggs under the Note therefore is $284,353.20;

6.      That Mrs. Griggs holds an allowed secured claim against the Debtor and his Chapter 11 estate in the amount of $284,353.20; and

7.      That any plan of reorganization in this case must treat Mrs. Griggs' claim as an allowed secured claim of $284,353.20.

Additionally, in the main case, an order will be entered overruling the Debtor's Objection to the Proof of Claim filed by Mrs. Griggs.

Signed on this 11th day of September, 2006.

Jeff Bohm
U.S. Bankruptcy Judge

48